Opinion delivered April 18, 1888.

## No. 5697.

## GUY BEAN *v.* THE STATE.

1. MURDER—AGRAVATED ASSAULT AND BATTERY—INDICTMENT.—Article 714 of the Code of Criminal Procedure declares that murder includes all the inferior degrees of culpable homicide, and also an assault with intent to commit murder, and that an assault with intent to commit any felony includes all assaults of an inferior degree. It is no longer an open question that, under this statute, a conviction for aggravated assault may be had under an indictment for murder.

2. SAME.—The indictment in this case charges that the appellant did "unlaw‑fully, and with his implied malice aforethought, kill and murder Samuel Wooldridge, by then and there striking, beating, bruising and wound‑ing said Wooldridge with a stick." *Held* that, independent of the rule announced in the first head note, the indictment sufficiently charges the offense of aggravated assault and battery, under the seventh subdi‑vision of article 488 of the Penal Code, which makes an assault aggra‑vated "when serious bodily injury is inflicted upon the person as‑saulted."

3. SAME—SELF DEFENSE—CHARGE OF THE COURT.—See the opinion, in extenso, and the statement of the case, for evidence under which the trial court in connection with its general charge on self defense, should have instructed the jury, in effect, that if there was no cessation of the conflict between the defendant and the deceased from the time the first blow was struck, and the deceased struck the first blow with an iron scoop, and the defendant struck with a stick in his own self defense, then the latter was guilty in law of no offense whatever.

4. SAME.—Under the facts of this case the trial court erred in omitting to charge the jury, in connection with its general charge on self defense, to the effect that if the defendant was assaulted on his own premises, or at his place of business, by the deceased, with an instrument calculated to inflict serious bodily injury upon him and if he then retreated and picked up the stick—an instrument of like character—with which to defend himself, and having returned to the scales, where he had the right to go, with no intention of himself renewing the conflict, and deceased again assaulted him with the iron scoop, then and in that event defendant, in his necessary self defense, had the right to use the stick in repelling such second assault upon him, and if in doing so he killed deceased, then, under such circumstances he would be guilty of no offense, and he should be acquitted.

5. SAME.—The charge of the court was otherwise insufficient in that it restricted the defendant's right of self defense to a combat with deceased alone, and to appearances of danger from the deceased alone. Whereas the proof disclosed the presence and co-operation of another man with the deceased, and hostile demonstrations towards defendant of such other person.

APPEAL from the District Court of Lamar. Tried below before the Hon. D. H. Scott.

The indictment charged the appellant, in the second degree, with the murder of Samuel Wooldridge, in Lamar county, Texas, on the twenty-sixth day of October, 1886. The conviction was for aggravated assault and battery, and the penalty assessed by the verdict was a fine of one thousand dollars and confinement in the county jail for the period of eighteen months.

S. C. Vaughan was the first witness for the State. He testified that he and the deceased went together to the gin of Colonel Bean, the defendant's father, near Brookston, in Lamar county, on the twenty-sixth day of October, 1886, taking with them a load of seed cotton. They reached the gin between nine and ten o'clock in the morning. Defendant weighed the load of cotton and witness and deceased threw it off the wagon. Witness then went up stairs in the gin and asked defendant when he and deceased could get their seed. Defendant replied that witness and deceased had ninety bushels of seed there from the first cotton that had been ginned for them, but that they owed the gin three dollars for the wrapping of three bales of cotton, and that he did not want the seed taken away until the amount was paid. He concluded by asking witness to tell deceased to come up stairs. Witness returned to deceased and told him that defendant wanted to see him up stairs. Witness and de-

ceased then went up stairs together. Witness stopped at the door of the gin house, and deceased walked back to the gin stand, in the rear of the gin house, near which the defendant was standing, and said to defendant: "What do you mean by sending me such word?" Defendant replied that he meant what he said, and that he had stated the rule of the gin. Deceased then said to defendant: "You act like you think I am trying to beat you." Defendant replied: "No, Sam; this is father's rule." Deceased replied: "I don't like any such treatment. You can't show a man who will say I have ever refused to pay an honest debt." Deceased then paid the defendant three dollars, and after a few more words the witness, defendant and deceased walked out of the gin together. On the way out the witness asked the defendant for the scoops, with which to load the seed on the wagon. Defendant handed him two scoops, and the three parties went down stairs together. Witness then asked the defendant to point out the seed. Defendant said to deceased: "Sam, if you want to know how much seed you have here, come up here." Defendant was then standing near the scales. Deceased walked toward the scales with the remark: "I want no more d—d foolishness. This thing has got to be settled." Defendant replied that he did not want any foolishness. Deceased then said: "You have been monkeying with me ever since our little difficulty about the first cotton, and that is what is the matter with you now." A few more words were exchanged, when defendant seized a stick and rushed upon deceased, who backed a little and seized a scoop. Defendant struck at deceased with the stick, but deceased caught the blow with the scoop, and struck at defendant with the scoop, brushing his shoulder. Deceased then continued to back, followed by defendant, until he reached a point under the elevator, fifteen feet from where he commenced backing. They made several "passes" at each other with their weapons, but the blows were warded off by each. When deceased reached the elevator the defendant struck him on the head with the stick and felled him to the ground. After deceased fell, defendant raised his stick to a striking position, but witness could not say whether he so raised it before or after he, witness, reached the deceased. Defendant then threw his stick down, stood around a few minutes, and then walked off.

Deceased was rendered unconscious for a few minutes and bled freely. Witness raised him, bathed his face with water,

and then started with him to the wagon. He then complained that he was dizzy and could not see, and asked witness to stop a minute. Witness stopped with him for a short time, and then, with the aid of a gin hand, placed him in the wagon and took him to Brookston, about three-quarters of a mile distant. The blow was struck about twenty-five minutes after witness and deceased had unloaded the cotton from the wagon. Deceased and witness had previously hauled some cotton to Bean's gin, but had changed gins because of deceased's belief that defendant had not treated him fairly. The witness prevailed upon deceased to take the load to Bean's gin on the day of the difficulty. He urged him to do so because that was the nearest gin to them. Deceased and defendant appeared to be friendly when they met on that morning. The stick was lying eight er ten feet off when the defendant started to pick it up. It was about twenty feet from deceased. When defendant started to get the stick the deceased stepped back and picked up the scoop from the ground where witness had dropped it. The stick was an elm, about four feet long, and about as large around as a man's arm. Witness remained with deceased in Brookston about an hour, during which time his condition did not change. Deceased died about twenty days after he was struck by defendant.

Cross examined, the witness said that he now lived on the place of Jack Wooldridge, the brother of the deceased, but at the time of the difficulty he lived on the place of the deceased, and owned a half interest in the cotton with deceased. The gin belonged to Colonel Bean, the father of the defendant, but was in charge of the defendant on that day. After telling deceased that defendant wanted to see him up stairs, the witness went up stairs with deceased but stopped at the gin door, and did not go with him to where the defendant was. He did not hear anything that was said by deceased and defendant in their interview near the gin stand. When the three left the gin to go down stairs, the witness took the two scoops with him and put them on the ground, east from the gin house, and northeast from the scales, about fifteen or twenty feet from the scales. The scales were east of the gin house, and in front of the door. The elevator extended from the scales into the gin house. Witness identified the writing shown him as his testimony delivered on the examination trial of this defendant. According to that writing, he stated on the examining trial that he dropped the scoops southwest of the scales. That statement, and

not the one that he had made on this trial, is correct. Witness saw Alexander Johnson at the gin, with a load of cotton, on the morning of the difficulty. Witness did not think Johnson's wagon was on, though it was near the scales. Witness was standing within five or six feet of deceased at the time of the difficulty. Deceased was between witness and defendant, the latter of whom was near the scales. Witness did not know whether or not deceased advanced upon defendant with the scoop. Witness was at Brookston on the evening after the difficulty, but did not then tell either Kit Mann or David Ames that he did not see the beginning of the fight. He did not tell them that he did not see who struck the first blow because a wagon was between him and the combatants. Witness made no effort to keep deceased from assaulting defendant, nor did he ever tell Russell or Cooper that he tried to keep deceased from rushing upon the defendant. Witness had only a short talk with Kit Mann and made no statement to him about the difficulty. Several persons asked witness about the difficulty, but he declined to discuss it with anybody except Constable Frank Morris, to whom he made the statement he has now made on the stand. No person save witness, defendant, deceased and the negro, Alex. Johnson, was at the gin at the time of the difficulty; at least witness saw no other person.

Doctors Hooks and Smith testified, for the State, that the cause of the death of the deceased was a fracture of the skull, inflicted on or about October 26, 1886.

Constable Frank Morris testified, for the State, that he went to Bean's gin after the difficulty between defendant and deceased, and got the stick now in evidence. It then had blood and what witness took to be human hair on it at one place. Witness took the stick to the examining trial of the defendant and gave it to the sheriff or one of his deputies.

R. Wooldridge testified that the deceased, who was his brother, weighed, at the time of his death, between ninety-five and one hundred pounds. He had been in delicate health for years before his death.

The State closed.

W. P. Cooper was the first witness for the defense. He testified that he was running the engine at Colonel Bean's gin on the day, and at the time, of the difficulty between the defendant and the deceased. He saw deceased and Vaughan when they came to the gin with the cotton. He saw them again after their

cotton was unloaded. They came into the engine room together. Deceased said to Vaughan as they entered the engine room: "I don't see how in the hell my wagon weighs ninety pounds less than it did yesterday morning. It looks like they are trying to cheat me. I'll be d—d if I don't have satisfaction before I leave here." He spoke in an angry tone of voice, and appeared to be mad. Deceased and Vaughan then went up stairs into the gin room, and soon came back, each having a scoop in his hand. Defendant came down stairs with them. The difficulty occurred a few minutes later. After the difficulty was over, witness saw deceased lying on the ground under the elevator, and the scoop was lying about four feet from him. Alex. Johnson's wagon was then on the scales. While working with the deceased, Vaughan said that he tried to keep him from rushing on the defendant, but could not do it.

Cross examined, the witness said that he was in the employ of Colonel Bean at the time of the difficulty between the defendant and the deceased. The engine room was about eighty feet south of the gin house. The gin stairway was on the east end, and outside of the house, inclining to the south. Witness, from his position in the engine room, could, and did, see the parties plainly when they went down stairs, the deceased and Vaughan each having a scoop. Defendant had nothing in his hands at that time. The cotton seed was kept down stairs and the scoop up stairs. Defendant was foreman of the gin. Witness did not tell Mr. Brown that he did not see any part of the difficulty, but did tell him that he did not see any of the fight. Witness did not know why the deceased came into the engine room. Vaughan came into that room to smoke, and did smoke a few minutes, when he and deceased left.

Mr. Russell testified for the defense, that he was at work at Colonel Bean's gin at the time of the difficulty between defendant and deceased. He saw deceased and Vaughan when they got to the gin with their load of cotton, which was weighed by the defendant. Deceased and Vaughan soon afterwards went up stairs to where the defendant had preceded them, and deceased asked the defendant about the seed and said to him: "God d—n you, did I ever beat you out of anything?" Defendant replied: "It is the rule of this gin that all dues must be paid before the seed is taken away." Deceased replied: "D—n such rules." Defendant said: "It is my father's rule and I must carry it out." Deceased replied: "D—n the rule and your father, too." Defend-

ant then told deceased to go to the house and settle with Colonel Bean, who, he said, had the books. Deceased then took some money from his pocket and offered it to the defendant. Defendant said to him. "Sam, I would rather you would settle it with my father." Deceased pressed the money into the defendant's hand, and then he and defendant and Vaughan, who was standing near, started towards the front door of the gin house. Deceased appeared to be very angry, whereas the defendant was calm and quiet. Vaughan asked for scoops as they passed out and defendant handed one to him and one to deceased. When the parties reached the door the witness, who was in the gin house, saw deceased shaking his left hand at defendant's breast, talking angrily the while. He then had the scoop in his right hand. Witness could not hear what was said. The three parties then went out at the front door. About two minutes after the parties passed out of the front door the defendant came to that door and called witness to him. When witness reached him he pulled his shirt back and showed witness a fresh wound on his shoulder and said: "That d—d Wooldridge struck me with a scoop and I knocked him down with a stick." The wound was on the defendant's left shoulder and was about five inches long and two or three inches wide. Witness then observed deceased near the elevator with blood over his face. Vaughan was standing near him. Witness went to deceased and while his face was being washed deceased said: "D—n him, I will settle with him when I get straight." Vaughan then remarked that he tried to keep deceased from rushing on defendant but could not do it. Deceased was then removed to a point near the gin where he could get the wind and was soon placed in a wagon, which Vaughan drove off. The scoop which the deceased used in that fight was an iron instrument used for the handling of grain and seed and weighed about six and a quarter pounds. Alex. Johnson's wagon was standing on the scales when witness went to the door, which was after the fight was over.

Cross examined the witness stated that he was living at Colonel Bean's and was in Bean's employ at the time of the difficulty. Mr. Vaughan came up stairs alone and asked for the scoops before he and the deceased came up together. Defendant told Vaughan that there were some dues to be paid before the cotton seed could be removed and to tell deceased to come up stairs and see him. Vaughan then went down stairs and soon

returned with deceased. Deceased's wagon at the time of the difficulty was standing northwest from the scales. Alex. Johnson went off with deceased after the difficulty. Witness was living at Bean's at the time of the examining trial but did not testify on that trial.

Kit Mann testified for the defense, that he met S. C. Vaughan in the store of Hawkins & Mallory in Brookston on the evening of the day after the difficulty, on which occasion Vaughan told him that he did not see the beginning of the fight between defendant and deceased; that a wagon was between him and the combatants and he did not see who struck the first blow. Vaughan did not make a detailed statement of the fight to witness. The witness had no particular interest in the defendant.

David Ames testified that he was present and heard the above statement made by Vaughan to Mann.

Alex. Johnson was the next witness for the defense. He testified that he witnessed the fight between defendant and the deceased. He was standing in his wagon at the time, and his wagon was on the scales. Defendant came to the scales and took his position at the weigher's stand. Deceased, who was then six or seven feet northwest of the defendant, said to defendant: "Guy, I want my seed; I want no God d—d foolishness!" Defendant replied: "Sam, these are my father's rules and I can not vary from them. You go to the house and see father." Deceased replied: "God d—d your rules, and your father and you too," and made at defendant, and struck him a glancing blow on the shoulder with a scoop. Defendant then turned, picked up a stick, and came back towards deceased, who was then on the platform of the scales. Defendant stepped towards deceased, who struck at him again with the scoop. Defendant warded off the blow with his stick, and deceased stepped backward, striking at defendant with the scoop, defendant striking with the stick. Several blows were struck by each party without taking effect, until deceased passed under the elevator, when defendant struck him over the head with the stick and he fell to the ground. When deceased fell, defendant raised his stick and turned towards Vaughan, who was standing near with an uplifted scoop in his hands, held in a striking position, and said to him: "If you don't drop your scoop, I will knock you down." The stick used by defendant was about four feet long. Defendant clasped and held that stick in the middle for the purpose, as the witness supposed, of

warding off blows he expected from both deceased and Vaughan. After striking deceased, the defendant put down the stick and walked off towards the house. He did not attempt to strike the deceased a second time.

Cross examined, the witness said that the deceased was a very small man, and that the defendant was a very stout one. Defendant walked ten or twelve steps from where he was when the deceased struck him with the scoop, to pick up the stick. Deceased remained on the platform of the scales while defendant went after the stick. The two men then met each other and commenced striking. Deceased backed from that time until he was knocked down. Witness testified on the examining trial that Vaughan came up with his scoop drawn, when defendant knocked deceased down, and he thought that statement was correct. Defendant came to witness's house, on Captain Henderson's place, with Doctor Shaefer on the night after the difficulty. Doctor Shaefer told the witness that he wanted a true statement of the difficulty, which witness made, and Doctor Shaefer wrote down. He asked witness to make a true statement of the matter in order to satisfy the parents of the defendant. Witness signed that statement after it was written out by Doctor Shaefer. Vaughan did not, that witness saw, attempt to strike defendant when he had his scoop drawn. Witness could not say that Vaughan intended to strike anybody with the scoop, but he came up with it in a striking position, about the time that defendant knocked the deceased down.

Justice of the Peace Miner testified, for the defense, that, about two hours after the difficulty, the defendant showed him his shoulder, on which there was a fresh wound, about five inches long and about two inches wide. The blood had come to the surface.

The motion for new trial raised the questions discussed in the opinion.

*Maxey, Lightfoot & Denton,* and *Hale, Hodges & Park,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. In this case the indictment was for murder of the second degree, the charge being that appellant "did, unlawfully, and with his implied malice aforethought, kill

and murder Samuel Wooldridge, by then and there striking, beating, bruising and wounding him, the said Samuel Wooldridge, with a certain stick," etc. At the trial had upon this indictment, appellant was convicted of aggravated assault and battery, the penalty- assessed being a fine of one thousand dollars, and eighteen months imprisonment in the county jail.

1. It is contended that, under the indictment for murder of the second degree in this case, a conviction can not be had for aggravated assault and battery, because the essential elements of the latter offense are not set out nor embraced in the charge of murder of the second degree. This is not a new question in this State. It came up directly in Green's case, 8 Texas Court of Appeals, 71, and it was then held that, under the provisions of article 714 of the Code of Criminal Procedure, such a conviction could be sustained, it being expressly provided that murder includes assault with intent to murder, and that assault with intent to commit any felony includes all assaults of inferior degree.

Independently of this article 714, we are further of opinion that the indictment in this case is sufficient, even in setting forth the offense of an aggravated assault and battery, under the seventh subdivision of article 488 of the Penal Code, which makes an assault aggravated "when a serious bodily injury is inflicted upon the person assaulted." Now, the indictment charges that the appellant killed and murdered the deceased, by "striking, beating, bruising and wounding him with a stick." It is clear that he could not have done this without inflicting serious bodily injury upon him. It is true, the exact statutory words which we have quoted are not used in the indictment, but the substituted words are, if not equivalent, certainly of more extensive signification than the statutory words, and this is all that is required. (13 Texas, 33; Kerry v. The State, 17 Texas Ct. App., 180; Lantznester v. The State, 19 Texas Ct. App., 320; Clark's Texas Crim. Law, p. 420 and note.)

2. It seems that, a short time previous to the homicide, the appellant and the deceased had some misunderstanding regarding their business transactions, but it does not appear to have ripened into hostility. At all events defendant's conduct towards deceased, just prior to the fatal difficulty, indicated a desire upon his part to avoid further trouble with him. There is a conflict in the evidence of the only two witnesses who profess to have seen what actually occurred immediately at the rencontre—the State's witness making the defendant the aggressor who

struck the first blow, and the witness for the defense swearing that when "defendant told deceased of the rules which his (defendant's) father had adopted with regard to his business, in connection with the ginning of cotton, and had said: 'You go to the house and see my father,' Wooldridge (deceased) said: 'God d—n the rules, your father and you, too!' and made at Mr. Bean and struck him a glancing lick on the shoulder with a scoop. Mr. Bean (defendant) then turned and picked up a stick and came back towards Wooldridge, who was then on the platform of the scales. Defendant stepped towards Wooldridge and Wooldridge struck again at defendant with the shovel or scoop, who knocked the lick off with the stick. Wooldridge then stepped backward, striking at the defendant with the scoop and defendant striking with his stick. Several licks were passed before either was struck again, each warding off the other's licks. They backed in this position—Wooldridge backing and striking with the scoop and defendant striking with his stick—until Wooldridge came under the elevator, when defendant hit Wooldridge with his stick and Wooldridge fell to the ground. As soon as Wooldridge fell defendant raised his stick and turned to Mr. Vaughan and said: 'If you don't drop your scoop I will knock you down.' Vaughan was standing close to Wooldridge and had his scoop in a striking position." This witness stated that after defendant was first struck by Wooldridge defendant turned and went ten or twelve steps and picked up the stick and returned to the place of conflict. From first to last it appears that but very few minutes elapsed from the commencement to the end of the difficulty.

Upon this state of facts, in its application to the law of self defense, the court, amongst other matters, thus instructed the jury in the seventeenth paragraph of the charge: "If Wooldridge attacked defendant in such manner and with such means as reasonably indicated an intention on the part of Wooldridge to take defendant's life, or to do him some serious bodily injury, yet, if before the fatal blow was struck, such appearances of danger to defendant had ceased, and he, defendant, afterwards renewed the difficulty with the intention of taking Wooldridge's life, or doing him some serious bodily injury, then defendant, in such subsequent acts, would not have the right of self defense. But if defendant renewed the difficulty (if you find he did renew it) with no intention of killing Wooldridge, or doing him some serious bodily injury, then you will apply the rule of law ex-

plained in the fourteenth sub-division of this charge" (which was as to aggravated assault where the homicide was with an instrument not in its nature calculated to produce death, and under circumstances showing no intention to kill and no self defense.) "If you find that the rencontre, from the first acts of violence, was continuous and without actual cessation till the fatal blow was struck, then the rule of law stated in this subdivision of the charge would not apply." In connection with this latter proposition, the court should have instructed in substance that if there was no cessation from the time the first blow was stricken, and deceased struck the first blow with the iron scoop, and defendant struck with the stick in his own self defense, then he would be guilty of no offense whatever in law.

　Again, in connection with this seventeenth paragraph, and as part of the law of the case, the court should have instructed the jury, in substance, that if defendant was assaulted on his own premises, or at his own place of business, with an instrument calculated to inflict upon him serious injury, and he retreated and picked up the stick, an instrument of like character, with which to defend himself, and, having returned to the scales, where he had a right to go, with no intention of himself renewing the conflict, and deceased again assaulted him with the iron scoop, then, and in that event, defendant, in his necessary self defense, had the right to use the stick in repelling such second assault upon him, and if, in doing so, he killed deceased, then, under such circumstances, he would be guilty of no offense, and they should acquit him.

3.　Another complaint is, as we think, also justly urged to the charge of the court.　It is that the court restricte I the defendant's right of self defense to a combat with, and appearances of danger from the deceased alone.　It is shown by the evidence that the deceased and the State's witness Vaughan were together interested in the getting of the cotton seed which was the cause of the difficulty.　Vaughan is directly connected with deceased in the matters and circumstances attendant upon the transaction.　He is also armed, as was the deceased, with an iron scoop, and, according to the testimony of defendant's witness, defendant, during the conflict, is using his stick to "ward off both Wooldridge and Vaughan," and, when the former has been felled to the ground, defendant turns upon Vaughan, who has his scoop raised in a striking position, and tells him: "If you do not drop your scoop I will knock you down."　The

charge of the court was excepted to because it did not set forth clearly the doctrine of self defense as applied to the two assailants, Wooldridge and Vaughan. We are of opinion that the exception is well taken. (McLaughlin v. The State, 10 Texas Ct. App., 340; Cartright v. The State, 16 Id., 474; **Jones v. The State**, 20 Id., 665.)

Because the charge of the court did not sufficiently submit to the jury the law of the case in the particulars pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*