**182 P.2d 920**

**STATE v. SINGLETON.**

**No. 970.**

Supreme Court of Arizona.

July 11, 1947.

H. K. Mangum, of Flagstaff, and Dodd L. Greer, of Holbrook, for appellant.

John L. Sullivan, Atty. Gen., Perry M. Ling and Gen. William P. Mahoney, Jr., Asst. Attys. Gen., and William W. Stevenson, Co. Atty., of Flagstaff, for appellee.

UDALL, Justice.

The defendant (appellant) was charged by information filed in the Superior Court of Coconino County with three counts of murder and one count of assault with intent to commit murder. All alleged offenses occurred within a brief space of time at approximately 2 A.M. on May 16, 1946, in front of defendant's home in Bellemont, Arizona. A five day jury trial (September

3–7, 1946) resulted in the conviction of defendant on count I for murder in the second degree of LeRoy Blevins, and on count III for the manslaughter of Henry Blevins. Verdicts of acquittal were rendered on count II charging the murder of Ernest Blevins, and on count IV charging an assault with intent to murder Oscar Blevins. From the judgments of conviction wherein defendant was sentenced to serve 12 to 15 years on the second degree murder charge and, running concurrently, 3 to 6 years on the manslaughter charge, and from the court's denial of his motions for a new trial and in arrest of judgment, this appeal was taken.

The facts developed at the trial were these: Defendant Henry Singleton was a resident of Bellemont, Arizona, a settlement some twelve miles west of Flagstaff and adjacent to the Navajo Ordnance Depot. For the past four years and at this time he was employed at that Depot as a guard by the United States Government. His hours of work on the day in question were from 3:30 P.M. to 11:30 P.M.

His home consisted of a living room, two bedrooms and a kitchen together with a small cabin located approximately thirty feet south of the main residence. There were but two usable entrances or doorways into the home, the principle one being a north door leading to the bedroom where defendant slept, and, on the east, a kitchen entrance consisting of an outer screen door, a small entry way and a wooden door into the kitchen proper. The occupants of the home on the night in question were the defendant, his wife, a twelve year old adopted daughter, Leonard Gore (defendant's grown stepson), and Ella Blevins (the estranged wife of Ernest Blevins who had lived with the Singletons since March 1, 1946).

On the evening of May 15, 1946, Ernest Blevins together with his brothers Oscar Blevins and Henry Blevins, a cousin, LeRoy Blevins, and the latter's friend, one Harvey Smith, were in attendance at a dance at the Bellemont Inn, a tavern on U. S. Highway 66, some 500 to 600 feet north of defendant's home. These men, but for the exceptions hereafter noted, spent the evening at said tavern and an adjacent cabin dancing, drinking and talking with friends until closing time at about 1:00 A.M. Thereupon the five of them accompanied by one Dorothy Etheridge drove west on Highway 66 some three and one-half miles to Jensen's Barbecue stand where sandwiches and coffee were obtained and consumed. They then returned to Bellemont where they turned off the highway and proceeded to defendant's home, stopping their car within 6 to 8 feet of the north bedroom door. No reasonable explanation was given by any of the car's occupants as to the purpose of this visit to defendant's home in the dead of night. But judging by their two verdicts of acquittal, it seems the jury believed this nocturnal excursion to be other than a legitimate and peaceful mission.

Defendant's wife and other occupants of the Singleton home testified that near the hour of 10:00 P.M. Ernest Blevins had apapeared at the north living room door where he made inquiry of Mrs. Singleton as to whether everyone was in bed, and to her affirmative reply answered, "That's a God-damn lie." He made no other disturbance at that time and departed. About one hour later Ernest appeared again, this time at the kitchen door and accompanied by another man identified by a neighbor lady as LeRoy Blevins. When Mrs. Singleton refused to let him in, he made considerable disturbance, banging and shaking the latched kitchen screen door, and becoming quite abusive towards her. He told her that what he wanted to do was "to get those two sons-of-bitches together and kill them." His parting statement was "very well, I know you wón't open the door, but I will be back with authority to come in." Both men appeared to have been drinking and seemed in a highly belligerent mood. When defendant, with his neighbor and fellow guard, Mr. Richards, returned home from work about midnight, his wife, highly upset, related to him in detail the happenings of the evening. He attempted to quiet her fears and "told her to go on to bed, they was just drunk, it was drunk talk" whereupon they all retired. Upon the facts thus far there is virtually no disagreement except that the State offered in rebuttal the negative testimony of others from the Bellemont Inn Tavern to the effect that they did not remember any of the Blevins men leaving the dance at any time during the evening.

As to the homicides, it is the State's version that when the Blevins' car stopped in front of defendant's home, Ernest Blevins started to get out of the left rear door when, without warning or provocation, the defendant fired at him from the north bedroom door and, thereafter, in rapid succession fired four or five more shots hitting the deceased persons and Oscar Blevins as quickly as they could climb out of the car. The state contends that Ernest was the first and Oscar the last man shot, while the defense contends the reverse to be true.

The defendant's story is, however, that he was awakened at approximately 2 A.M. by a disturbance at the kitchen door which sounded like the noise of a screen being torn. Without rousing the other members of the family or stopping to dress, he picked up his loaded shot gun and opened the north door to his bedroom at which instant he was confronted immediately by two men standing in the bright moonlight. One, standing directly in front of the car he recognized as Oscar Blevins while the identity of the other, standing in back of the car, he was unable to distinguish. In response to defendant's query "what is this, what are you trying to do?" both men started toward him saying that they were coming in. He told Oscar to stop, and when he continued to advance and made a movement towards his hip, defendant fired, first at Oscar and then at the other man who was

coming towards him, and who then turned and disappeared behind the house. Defendant testifies that thereupon: "I kind of stepped out on the front of my door, and three men come from behind the house, and a woman, and just as the men got right out between the cars they said, 'There's the damn son-of-bitch, come on.' I told them to stop, and they didn't, and I fired another shot. And there was one guy run off towards the saloon, and I don't know where the other went, and Ernie hesitated, then started on, kept coming. I told him not take no more steps, he taken another, and I fired. He throws up his hands and wheeled around and fell."

After the shooting was over, it having all occurred in a few short minutes, the girl, Dorothy Etheridge, was told to get away from there. She went on foot to the nearby Inn and telephoned the police. Defendant dressed, went to the home of his neighbor Mr. Richards and told him what had happened, stepped out for a moment to telephone the sheriff's office at Flagstaff, and then came back to the Richards' home to await the arrival of the officers to whom he peaceably surrendered some thirty minutes later. In the meantime, the wounded Oscar Blevins had been driven to the hospital in the Blevins car by Harvey Smith.

When Sheriff Francis and Deputy Walker arrived upon the scene they found Henry Blevins lying wounded in the front seat of Singleton's Ford coupe which was parked in the alley to the east of his house. Ernest Blevins, also wounded was found lying on the ground some twenty-one feet northeast of the bedroom door from which the shots were fired. Ambulances were called and the mortally wounded men were removed to the Flagstaff hospital where both died between 7 A.M. and 8 A.M. that same morning and were, before their deaths, apparently unable to give their versions of the shooting. At the coming of daylight, the body of LeRoy Blevins was found dead on the north side of a building some 170 feet northeast of the Singleton house. The officers further discovered that the screen had been partially ripped from defendant's kitchen door, and the door to the small cabin south of the main house had been broken or kicked in. A nearly empty quart bottle of whiskey and an empty beer bottle were found near where the Blevins' car had been parked, and later a full quart of whiskey was found in the car itself. Doctor Kitteridge testified that Henry Blevins died from a gunshot wound of the abdomen, the four shot having entered from the right side and slightly toward the back; and that LeRoy Blevins died from a gunshot wound of the chest, the shot having entered from the back.

There was no evidence of any previous trouble between defendant and the Blevins men, and, while he knew both Oscar and Ernest, it appears that he was unacquainted with either Henry or LeRoy both of whom he was convicted of killing. The gun had been purchased by defendant lo-

cally as a hunting weapon a month before the homicides. No weapons other than one small pocket knife were found on any of the Blevins party.

The defendant presents, in all, eight assignments of error with a corresponding number of propositions of law. Assignments I and VI logically can be considered together. The first assignment states:

"The Court erred in submitting to the jury the issue of whether Defendant was guilty of murder in any degree under any count in the information for the reason that there was no evidence to support the Court's charge."

And assignment VI states, in part, that:

"The Court erred in denying Defendant's motion for a new trial and in arrest of judgment for the—reason that the proof adduced at the trial disclosed but a single transaction."

In this regard it is defendant's theory that the record presents no evidence of malice, premeditation or deliberation, or facts or circumstances from which these could be implied, as to any of the four offenses charged by the information. And, therefore, nothing to justify the submission of murder verdicts or the giving of any instructions to the jury on the issue of murder. Further, that as to count I of the information (charging the murder of LeRoy), there is but scant evidence to connect him with this homicide and no evidence suggesting that he knew LeRoy to be among those whom he shot. And, following therefrom, there was no evidence to sustain the conviction of defendant for murder in the second degree of LeRoy Blevins. Finally, that the jury reached an untenable result in finding defendant not guilty on two counts and guilty on one count of murder in the second degree and one count of manslaughter for the reason, defendant maintains, that this is but one crime, one transaction, and, therefore, if the jury found malice to be absent in certain of the killings, it must be absent from them all.

As Chief Justice Lockwood so well stated in Macias v. State, 36 Ariz. 140, 283 P. 711, 716, it is true that: " * * * instructions must be based on some theory of the case which may be found in the evidence, and, when not so predicated, they should not be given, as their tendency would be to mislead the jury." It is further correct that murder in the second degree must be "with malice aforethought" while murder in the first degree must, in addition, be a "willful, deliberate and premeditated killing, or * * * committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary or mayhem * * *." Secs. 43-2901, 43-2902, A.C.A. 1939; Moore v. State, 65 Ariz. 70, 174 P.2d 282. Finally, proof of a homicide with a deadly weapon does not itself compel the presumption of premeditation or deliberation so as to make the offense first

degree murder. 40 C.J.S., Homicide, § 192. But by statute in Arizona, once the homicide by defendant has been proved in a murder trial, it is presumed that he is guilty of murder to the extent that he has the burden of proving mitigating circumstances so long as the State's evidence does not tend to show to the contrary. Sec. 44-1814; Miranda v. State, 42 Ariz. 358, 26 P.2d 241; Viliborghi v. State, 45 Ariz. 275, 43 P.2d 210; Harris v. State, 46 Ariz. 121, 46 P.2d 1082; State v. Ponce, 59 Ariz. 158, 124 P.2d 543. See also State v. Grayson, 126 Or. 560, 270 P. 404. Premeditation and deliberation may be shown by facts and circumstances surrounding the homicide, (Moore v. State, supra; Sullivan v. State, 47 Ariz. 224, 55 P.2d 312; Harris v. State, supra; Miranda v. State, supra; People v. Wells, 10 Cal.2d 610, 76 P.2d 493; People v. Buenaflore, 40 Cal.App.2d 713, 105 P.2d 621) and malice in law does not require actual malice toward the unintended victim, Mayweather v. State, 29 Ariz. 460, 242 P. 864. Taking these rules of law together with the testimony of two of its witnesses, Oscar Blevins and Dorothy Etheridge, the position of the wounds inflicted, and the surrounding facts and circumstances of the case, it can hardly be said that the State's evidence necessarily points in a direction opposite than that of murder. Therefore, on this score at least, the submission to the jury of murder verdicts together with instructions to the jury on the crime of murder were justified.

■ As to LeRoy's death, there is sufficient testimonial and circumstantial evidence connecting defendant therewith to justify defendant's conviction of murder in the second degree on this count. Defendant testified that he shot a man who afterwards ran north. The next morning LeRoy was found dead some 170 feet northeast of defendant's house having died from wounds resulting from a shotgun charge. It is established that LeRoy as driver of the Blevins' car was at the scene at the time of the shooting; Oscar testified that he saw him shot; defendant never denied that he shot LeRoy, and there was never any intimation that LeRoy met his death other than as the result of the gunshot wound inflicted by defendant.

■ As to the contradiction that defendant claims is inherent in the verdicts, we find it to be the settled majority rule of law that although several shots be fired in such quick succession that they constitute in effect, but one act, still, the result may involve more than one offense so that an acquittal on a trial for killing one will not prevent prosecution for killing another. The offenses though occurring almost simultaneously in point of time are rendered distinct and severable by a plurality of shots and of objects. 1 Wharton's Criminal Law, 12th Ed., 52, also n. 16; 26 Am.Jur. 276; State v. Corbitt, 117 S.C. 356, 109 S.E. 133, 20 A.L.R. 341; State v. Fredlund, 200 Minn. 44, 273 N.W. 353, 113 A.L.R. 222; People

v. Brannon, 70 Cal.App. 225, 233 P. 88. We refuse to follow the single transaction test adopted in a few jurisdictions. See: Burnam v. State, 2 Ga.App. 395, 58 S.E. 683; Cook v. State, 43 Tex.Cr.R. 182, 63 S.W. 872, 96 Am.St.Rep. 854; 22 C.J.S., Criminal Law, § 298, p. 452.

Defendant's assignment of error number IV goes to the following instructions of the court which defendant contends improperly characterize his acts of self defense as an assault.

"Ladies and gentlemen of the jury, all of these principles of law I read to you concerning the defense and the rights of the defendant to defend himself and his home covering the charges of murder are likewise applicable to this charge in the fourth count, charged with the intent to commit murder. In other words, *the defendant would be justified under the same rules of law and circumstances in defending himself and committing an assault in defending himself against an assault,* the defendant himself would be justified to the same extent he would be justified under the rules I have given for self defense. * * *" (Emphasis supplied.)

■ There is no question but that this court formerly has criticized just such an instruction, and that it is an improper statement of the law, Caston v. State, 24 Ariz. 593, 211 P. 866, although the Caston case actually turned upon another point. The act of self defense is never an assault.

But we doubt that whether under the circumstances of the case at bar this misstatement alone would constitute reversible error. In some respects, at least, it tends to favor defendant by suggesting that in the defense of his person and home defendant might be justified in committing an assault. And it seems to be at least partially cured by the last part of the above quoted instruction which refers the jury back to a previous portion of the instructions where the judge fully, thoroughly and correctly outlined the requirements for, and the legal effect of the act of self defense.

■ Defendant's assignment number VII goes to two more portions of the instructions one of which characterizes this case as presenting an "unusual situation", and the other in which the judge states that in giving his instructions he is going to keep them as simple and clear as is possible under the circumstances, commenting that the unfortunate "tendency of courts in giving instructions is to read long manuscripts of statements of law half of the lawyers do not understand, and the jury cannot." To our mind these appear as two highly accurate statements. This *is* an unusual case. We doubt whether anywhere in the annals of our State Reports can be found a comparable situation where the happenings of a few moments time could result in an indictment of a defendant for the murder of three men and assault with intent to murder a fourth. And court instructions *are* too often so technical as to be

confusing instead of helpful. Simplicity of instruction is a virtue, and in a case such as this where eighteen separate verdicts had to be submitted to the jury, it becomes a necessity. We cannot agree with defendant that these observations by the trial judge suggest to the jury that defendant's attorneys are incompetent, or that because this is an unusual case the judge expects them to hand down verdicts other than acquittals.

 Defendant's assignment number VIII goes to still another part of the court's instruction in which the requirement of malice was omitted from the definition of murder in the second degree. There can be no doubt but that malice is a necessary element of this crime, Secs. 43-2901, 43-2902, and were that the sole definition given of murder in the second degree, or if it stood so isolated in the instructions from proper definitions of the crime that it might be prejudicial, we would consider it reversible error. Stephens v. State, 20 Ariz. 37, 176 P. 579. However, both immediately before and immediately after this improper definition the judge properly, clearly, and at length instructed the jury on the elements of the crime of second degree murder including therein the necessary element of malice. And taken in its context, as it must be, the error was cured, for this court has repeatedly held that if, from an examination of the instructions as a whole, they are free from error, an assignment predicated upon an isolated paragraph, which standing alone might be misleading, will fail. Davis v. State, 41 Ariz. 12, 15 P.2d 242; Viliborghi v. State, supra; Harris v. State, supra; Maseeh v. State, 46 Ariz. 94, 47 P.2d 423.

Following a preliminary hearing before a magistrate on a criminal complaint charging the murder, in triple counts, of LeRoy, Ernest and Henry Blevins, the defendant was held to answer "for the crime of murder, a felony." The defendant now contends under assignment number II that based upon this commitment, the superior court had no jurisdiction to hear and determine other than one count of murder, and that the county attorney could not properly file thereunder an information charging three murders and an assault with intent to commit murder. Defendant relies upon our rule first announced in Fertig v. State, 14 Ariz. 540, 133 P. 99, which prohibits the filing of an information for any offense other than that for which the accused was held to answer by the committing magistrate. This decision interpreted Art. 2, Sec. 30 of the Arizona Constitution and sec. 769 of the 1901 Penal Code of Arizona. The constitutional provision remains the same and sec. 769, supra, has been carried forward, substantially unchanged, and now appears in our 1939 Code as sec. 44-323. The State, however, relies upon the new Code of Criminal Procedure adopted by this Court on April 1, 1940, and particularly that part thereof appearing as sec. 44-504 which reads, in part, as follows:

"\* \* \* the county attorney shall file an information charging the commission of an offense according to the evidence presented at such examination \* \* \*."

In order to dispose of this assignment of error number II we need not resolve the apparent conflict between our holding in the Fertig case, supra, interpreting sec. 44-323 and the new rule set forth in sec. 44-504, for the reason that the technical objection as to the sufficiency of the order holding this defendant to answer was first raised on his motion for a new trial filed after his conviction. Clearly such an objection comes too late as sec. 44-503 requires that:

"The fact that a preliminary examination was neither had nor waived shall in no case invalidate any information in any court *unless the defendant shall object to such information because of such fact before pleading to the merits.*" (Emphasis supplied.)

In passing upon this assignment we have ignored the revised commitment purporting to hold the defendant for "the crimes of murders and assault with intent to commit murder" filed in the superior court without judicial sanction or authorization, some two months after the trial was held. A questionable appellate record cannot thus be fortified. Furthermore we consider that the objection here made as to the sufficiency of the order holding him to answer would fall into the category of technical errors or departures that are declared harmless under sec. 44-3701, which reads:

"Neither a departure from the form or mode prescribed in respect to any pleadings or proceedings, nor an error or mistake therein, shall render the same invalid, unless it actually has prejudiced the defendant, or tended to his prejudice, in respect to a substantial right."

The defendant was not here prejudiced. There is no merit to the assignment.

Defendant's assignment of error number V is, we believe, well taken. It goes to the refusal by the court to give the emphasized part of the below quoted offered instruction:

"If from the evidence you believe that defendant killed Ernest Blevins, LeRoy Blevins and Henry Blevins, and shot Oscar Blevins, but further believe that at the time of so doing, the deceased persons and Oscar Blevins had made or were attempting to make an attack upon the person of the accused with intent to do him great bodily harm, or make an unlawful or forceful intrusion upon the home of the defendant, for a felonious purpose and against his will, which, from the manner and character of it, and the relative strength of the parties and *the defendant's knowledge of the violent, turbulent and dangerous character and disposition of the said Oscar Blevins and Ernest Blevins, if any,* caused him, acting as a reasonable man, to have a reasonable fear that they would carry

out their attempt, and that acting under such fear alone, the defendant shot the said Oscar Blevins, and the deceased persons, then you should acquit him." (Emphasis supplied.)

The State justified this deletion on the basis that: (1) Defendant had testified previously that he was friends with the Blevins boys; and (2) that the only one he recognized before the shooting was over was Oscar Blevins. Reasoning from the friendship, it is the State's contention that defendant's knowledge of the violent and turbulent characters of Ernest and Oscar could be of no effect to produce fear; that such knowledge of the nature of the character of Ernest should not be interposed as a defense for he wasn't recognized until after the shooting; and that, in all events, knowledge as to the dispositions of Ernest and Oscar could be no defense to the killing of Henry and LeRoy.

We believe that the State is wrong on each of these contentions. A man's friendship for another does not eliminate the fear he would have of that other when drunk if he knew that when in that condition the other becomes violent, turbulent, unmanageable, and generally "in a fighting mood." The testimony establishes beyond doubt that defendant knew Oscar and Ernest to be just such men and that defendant was well acquainted with some of the extreme limits of violence to which they would go when intoxicated. To say that this knowledge might not have added to

the total fear which a man in defendant's position might reasonably have had, is absurd. One might as reasonably contend that a fox hole soldier's reaction to a banzai charge would be no different than his reaction to a routine night patrol.

Further, though defendant may not have recognized Ernest until the shooting was over, he did know that Ernest had been to his house twice that same evening before the shooting; that he had been drinking; that he had threatened to kill two of the occupants of the house; that he promised to return later to carry out his threats, and that the occupants of the house were completely upset by this and had related their fears to defendant when he returned home from work. Under these circumstances it does not seem unreasonable for defendant, upon being awakened some two hours later by the ripping of a screen door and then recognizing Oscar and hearing him repeat the same threats that had been previously uttered by Ernest, to assume that Ernest was also present.

And, finally, as it appeared that all occupants of the car were acting together, defendant had the right to be fearful of all based upon the reputations for violence when drunk of one man whom he recognized and another whom he must have suspected was present, the latter's promise to return in order to kill constituting the only reasonable explanation for this 2 A. M. visit. Seeley v. State, 43 Tex.Cr.R. 66, 63 S. W. 309; Bean v. State, 25 Tex.App. 346,

8 S.W. 278; Black v. State, 65 Tex.Cr.R. 336, 145 S.W. 944. Defendant's knowledge of the turbulent reputations of these men making it not wholly unlikely that the whole group might well be there in order to carry out these threats is a most fundamental link in his claim that he was acting as a reasonable man would in his position, and was honestly engaging in defense of his person and home. He had a right to have this theory, which is fully supported by the evidence, presented to the jury.

Assignment number III reads as follows:

"The Court erred in permitting the State to cross-examine Defendant concerning other offenses against a third person, wholly unrelated to the offenses on which the Defendant was on trial."

Remembering that the very heart of defendant's case was that his acts on the night in question were acts in defense of his person, his home and his family, and remembering further that the evidence was conflicting, tending to support his theory on the one hand while suggesting murder on the other, the reputation of the defendant for being a peaceable man necessarily becomes of prime importance. In other words, in weighing the conflicting testimony given, it was extremely important and highly relevant for the jury to know whether Singleton was the kind of a man who might commit murder, or not. Defendant, realizing this and, apparently, being confident that his reputation for peace and quietude would support and not destroy him, put it in issue by calling six character witnesses, one of whom was the very magistrate who held him to answer. Each and every one of these witnesses testified that defendant bore a good reputation for being a peaceful and law abiding member of his community. The State in its cross-examination of these witnesses brought out nothing to in any way impeach their testimony. And, in fact, aside from the insidious and unproved "fishing expedition" set out below, the State neither offered to, nor did it prove anything to the contrary on this point.

However, after the defendant himself had taken the stand to testify at length as to the details surrounding the crimes of which he was accused, the following occurred on his cross-examination by the special prosecutor:

"Q. Now, have you ever had any trouble at any time? A. No, sir.

"Q. Have you ever made any threats? A. No, sir.

"Mr. Greer: your Honor, this is irrelevant, incompetent, and immaterial.

"The Court: Sustain the objection.

"Q. Well, he has put his character in issue.

"The Court: I am not quarreling with you about that.

"Q. All right. About two or three years ago, there was a man by the name of Macey, or Menacy or however? A. Menacey.

"Q. You know him, don't you? A. Lee Menacey?

"Q. Yes. A. Yes.

"Irvin Menacey? A. I think that is what they called him.

"Q. And a person by the name of Byers, a woman, didn't you, or Barum? A. Byrom, yes.

"Q. And you made some threats to Menacey, didn't you? A. No.

"Mr. Greer: We object, Your Honor, please. It is entirely immaterial.

The Court: The answer may stand.

"Q. And didn't you tell Evelyn Byrom that if this fellow Menacey didn't stay' away you were going to kill him?

"Mr. Greer: Your Honor, no foundation has been laid.

"A. No.

"The Court: The answer may stand.

"Q. And Mr. Byrom met you and asked you if you were going to kill him, and you had a gun on you? A. Mr. Byrom?

"Q. Or Mr. Menacey. And you turned and walked away without answering? A. I never done no such a thing.

"Q. That is just what I wanted to know. * * *"

It must be remembered in viewing the above quoted testimony that the State neither offered to nor did it substantiate the fact that actually the defendant had made the threats suggested. It never proved, in other words, that defendant was telling an untruth when he denied having threatened Mr. Menacey.

It is the State's contention that this line of questioning was not put to lay the foundation for impeachment, but was designed to rebut defendant's claim of self defense and on that basis was both admissible and proper.

The defense, however, claims that the above quoted line of testimony was wholly irrelevant and incompetent for any purpose and it was engaged in order to prejudice the defendant before the jury, by leaving the impression that he was a dangerous character who carried a gun and threatened to extinguish the life of another. Further, they contend that by naming a specific person, it was made to appear (though there was no attempt to prove it) that the county attorney had information concerning some previous acts of violence on the part of the defendant thereby discrediting the testimony concerning his previous good character.

 First, if this line of questioning was intended to bring out prior offenses committed by the ·defendant (assuming for the moment that upon defendant's denial thereof, the State could prove the fact), such questioning and proof would be wholly improper, inadmissible, prejudicial, and grounds for a new trial as not coming within the well recognized exceptions to the cardinal rule that prior offenses may not

be shown unless they tend to establish: (1) Motive, (2) intent, (3) absence of mistake or accident, (4) common scheme, (5) identity of person charged. Douglass v. State, 44 Ariz. 84, 33 P.2d 985; Greve v. State, 36 Ariz. 325, 285 P. 274; Vigil v. State, 33 Ariz. 51, 262 P. 14; Short v. State, 53 Ariz. 185, 87 P.2d 266; Carter v. State, 18 Ariz. 369, 161 P. 878; State v. Byrd, 62 Ariz. 24, 152 P.2d 669.

Next, if the questioning was engaged in to establish prior acts of misconduct (still assuming it to be followed by proof upon defendant's denial thereof, and this certainly would be an act of misconduct as a threat when not coupled with an overt act is not an offense), then the courts and legal authorities are split as to its admissibility.

2 Bishop's New Criminal Procedure, 2nd Ed., secs, 1124, 1122, takes the following position:

"Even where offenses are of a like sort, evidence to one is not ordinarily admissible in proof of another; as * * * for the murder of a particular person, that at another time and place he * * * threatened another person. * * *"

"Cross-examinations * * * and evidence to discredit them, * * * will not be permitted (such) a scope * * * for this, under the pretence of justice, would be a wanton prejudice to the defendant."

To this effect see also: 1 Wharton's Criminal Evidence, 11th Ed., sec. 337. Other courts and authorities support the view that to a limited extent and at the court's discretion such cross examination is admissible. 20 Am.Jur., Evidence, sec 326; 22 C.J.S., Criminal Law, §§ 676, 678; 70 C.J., Witnesses, secs. 1035, 1044, 1094; III Wigmore on Evidence, 3rd Ed., secs. 891, 979, 987, 1005; State v. Shull, 131 Or. 224, 282 P. 237, 71 A.L.R. 1504. In each of these, however, the lines are not clearly drawn differentiating the rules applicable on rebuttal versus cross examination; those applicable to defendants as opposed to their witnesses; or those which refer to prior crimes as distinguished from past acts of misconduct not amounting to a crime. In all cases, however, the reason for either closely limiting or completely denying such cross examination is that a person on trial charged with a particular crime should not be required to defend against every possible aspersion which may be made against him but which is in no way connected with the issue to be determined. In 20 Am.Jur., sec. 326, p. 306, this pertinent statement is found:

"Evidence of specific acts or of conduct of a person upon particular occasions, bearing upon his character, is usually held to be inadmissible. The admission of such evidence would raise collateral issues and divert the minds of the jurors from the matter at hand. It is manifestly unfair to compel a party to defend specific acts alleged as proof of bad reputation or character, although he must be prepared to defend his general reputation."

But when, as here, such questioning is raised and then dropped with no further attempt on the part of the State to prove its point, the aforementioned "fishing expedition" having failed, we believe it to be wholly improper and highly prejudicial. To allow this sort of examination would be to allow the imaginative and over-zealous prosecutor to concoct a damaging line of examination which could leave with the jury the impression that defendant was anything that the questions, by innuendo, seemed to suggest. If the questions were persistent enough and cleverly enough framed, no amount of denial on the part of a defendant would be able to erase the impression in the mind of the jury that the prosecutor actually had such facts at hand and that probably there was some truth to the insinuations.

We endorse what the Supreme Court of the State of Iowa in State v. Burris, 194 Iowa 628, 190 N.W. 38, at page 41, had to say of such tactics by a prosecutor:

"* * * it is not within the province of a prosecutor, under the pretense of affecting the credibility of the witness, to propound interrogatories without any pretense or attempt to establish the truthfulness of the matters suggested by such inquiry and solely to cast insinuations upon the defendant. To open the doors to the cross-examination of a defendant by a proceeding of this character would leave him subject to insinuation and suggestion of gross misconduct, without any semblance of basis to support the same and with limitations fixed only by the extent of the imagination of the interrogator and his audacity in propounding the inquiries. It is no answer to say that the appellant was not prejudiced by this cross-examination because he answered the questions in the negative, and no attempt was made by the state to prove the truthfulness of the matters suggested in the inquiry. * * *

"We think it was an abuse of the discretion lodged in the trial court to permit this examination to have been conducted to the extent that it was, and that it was necessarily prejudicial to appellant. It was an attempt on the part of the state to drag into the case, by insinuation and suggestion, matters that were collateral and irrelevant, for the obvious purpose of prejudicing the appellant in the eyes of the jury. Such methods to secure the conviction of one charged with crime do not comport with the spirit of fairness which has always been one of the most cherished tenets of our administration of criminal law."

See also: Buel v. State, 104 Wis. 132, 80 N.W. 78; People v. Holmes, 292 Mich. 212, 290 N.W. 384.

In Hash v. State, 48 Ariz. 43, 59 P.2d 305; Britt v. State, 25 Ariz. 419, 218 P. 981; Taylor v. State, 55 Ariz. 29, 97 P.2d 927; Walker v. State, 23 Ariz. 59, 201 P. 398; and State v. Byre, supra; our court has laid down the rule that no prosecuting officer, in order to impeach a witness, can engage in such questioning without being

prepared and able to prove the insinuations. Certainly if such tactics are improper and constitute reversible error when used in an attempt to prove a man to be a liar, they are all the more objectionable when used to try to prove him a murderer.

Under the interpretation we consistently have given sec. 22, Art. 6 of the State Constitution, the mere fact of error does not raise a conclusive presumption of prejudice. It is our duty, notwithstanding error, to examine the record and ascertain therefrom whether the error was, in fact, prejudicial to the accused. Comancho v. State, 39 Ariz. 556, 8 P.2d 772. While we appreciate the fact that, due to the human equation, no case was ever so perfectly tried that it could not be subject to some criticism, State v. King, 66 Ariz. 42, 182 P.2d 915, still one accused of crime, particularly a man on trial for his life, is entitled to a fair and impartial trial which does not violate any of his substantial rights. The test which we must apply is: Had the errors heretofore pointed out not been committed, is there reasonable probability that the verdict might have been different? In answering this question, the Supreme Court puts itself as nearly as possible in the position of the jury. Turley v. State, 48 Ariz. 61, 59 P.2d 312.

The alternatives with which we are faced are not those of either sustaining the conviction or allowing a possibly guilty man to go free. Instead, the real choice is between sustaining the conviction or awarding a new trial at the expense of the people in order to sustain defendant's constitutional rights to the fair and impartial judgment of a jury of his peers so that his guilt or innocence can properly be determined.

Because of the court's failure to give the proffered instruction set forth under assignment V, and its admission over objection of the improper and highly prejudicial cross-examination of defendant by the special prosecutor in asking the insinuating questions heretofore set forth haec verba under our discussion of assignment III, we believe that the verdict might have been different and that the defendant was, in fact, prejudiced in his rights.

The judgments of conviction are reversed and the cause remanded for a new trial.

STANFORD, C. J., and LA PRADE, J., concur.