McHugh, J.
Plaintiff in this action, Viatcheslav G. Abramian, was discharged from his position as a security guard at Harvard College. Subsequently, he brought suit against Harvard, against a co-worker and against several supervisory employees in the guard service claiming that his discharge was based on his Russian national origin and on retaliation for his assertion of a right to be free from discrimination based on national origin.
The case proceeded to trial where Mr. Abramian recovered a substantial verdict. In the wake of that verdict, defendants have filed a motion for judgment n.o.v., a motion for a new trial and a motion to alter or amend the judgment. Plaintiff, in addition to opposing those motions, has filed a motion for attorneys fees. Those motions are decided in the following fashion for the following reasons:
1. MOTION FOR JUDGMENT N.O.V.
In considering a motion for judgment n.o.v., the court cannot weigh conflicting evidence. Instead, the court must uphold the verdict as long as “anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor” of the verdict winner. Brown v. Gerstein, 17 Mass.App.Ct. 558, 560 (1984).
The evidence in this case, while not requiring a finding of discrimination or retaliation, surely supported a conclusion that both existed. The evidence included repeated instances of pejorative references to plaintiffs national origin and repeated pejorative references to the national origin of others. The incident which ostensibly led to plaintiffs discharge had overtones of discriminatory animus and took place in front of Dowling, a supervisory employee. In addition, there was evidence of disparate treatment of plaintiff with respect to disciplinary'matters. There was evidence from which a jury could conclude that the individual defendants against whom verdicts were returned interfered with plaintiffs contractual relations with Harvard for impermissible reasons. The jury was not required to believe any of that evidence but neither was it prohibited from doing so. And if it believed all of the evidence and if it drew from that evidence inferences unfavorable to Harvard, then clearly it was warranted in returning the verdict it did.
In their motion for judgment n.o.v. defendants, in addition to claiming that the evidence is insufficient to support any of the verdicts, assert that plaintiffs claim of wrongful interference with contractual relations is preempted by §301 of the Labor Management Relations Act, 29 U.S.C. §185. The insuperable difficulty with that argument is defendant’s failure to raise it earlier. A motion for judgment n.o.v. is really a revised motion for a directed verdict. Accordingly, “no grounds for [a] motion for judgment notwithstanding the verdict may be raised which were not asserted in the directed verdict motion.” Bonofiglio v. Commercial Union Ins. Co., 411 Mass. 31, 34 (1991).[1]
2. MOTION FOR NEW TRIAL
In ruling on a motion for a new trial, the trial judge cannot simply act as a thirteenth juror. See Clapp v. Haynes, 11 Mass.App.Ct. 895, 896 (1980) quoting Borras v. Sea-Land Serv., Inc., 586 F.2d 881, 887 (1st Cir. 1978). Instead, the trial judge may “set aside the verdict only if he [or she] is satisfied that the jury failed to exercise an honest and reasonable judgment in accordance with controlling principles of law.” Hartmann v. Boston Herald-Traveler Corp., 323 Mass. 56, 59 (1948). In other words, the question to be faced when the trial judge is presented with a motion for a new trial is whether allowance of the motion is necessary to prevent a failure of justice. Davis v. Boston Elevated Railway Co., 235 Mass. 482, 496 (1920). In ruling on the motion, the trial judge “may, and indeed should, judge credibility and weigh conflicting evidence.” J. Smith & H. Zobel, Rules Practice, 8 Mass. Prac. Series 442 (1977). In the last analysis
[a] motion to set aside a verdict as against the evidence is addressed to the sound discretion of the judge. “It is the right and duty of a judge presiding at the trial of a civil case to set aside the verdict of a juiy when in his [or her] judgment is so greatly against the weight of the evidence as to induce in his [or her] mind the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice.”
Solimene v. B. Grauel & Co., KG, 399 Mass. 790, 802 (1987).
Defendants make four principal assertions in support of their motion for new trial. First, they contend that plaintiffs counsel persistently inteijected irrelevant and inflammatory elements into the case. Second, they contend that the verdict is against the weight of the evidence. Third, they contend that the court gave erroneous instructions with respect to “burden-shifting.” Finally, they contend that the damages are largely duplicative, grossly excessive and, insofar as damages are concerned, based on faulty instructions.
A. CONDUCT OF PLAINTIFF’S COUNSEL
Throughout the trial, it was clear that John G. Swomley, Esq., plaintiffs counsel, was seeking to ensure that every thrust of his rapier cut close to the bone. Rarely, if ever, did he seek a motion in limine to alert the court to potentially prejudicial and inadmissible matters. Instead, he plunged ahead, content to let the court sort out the consequences of his actions after they had occurred. He repeatedly construed eveiy ruling limiting the admissibility of evidence in its *558 narrowest sense and, before acting on his narrow interpretation, rarely sought clarification of areas where the ruling may have been ambiguous. As a consequence, all save Mr. Swomley were constantly waiting with bated breath to see which grenade he would next heave over the transom. That made for an extremely difficult trial. The question here is whether it also skewed the results in an unfairly prejudicial manner.
Defendants point to four particular aspects of Mr. Swomley’s conduct they say produced unfair prejudice that profoundly tainted the trial. The first had to do with Mr. Swomley’s examination of one of the defendants, Dowling, regarding his support of the candidacy of David Duke. The second had to do with questions regarding areas of disparate treatment as to which there was no substantive evidence. The third had to do with repeated references to articles in the Harvard Crimson, a Harvard student newspaper, and to the so-called Ring Report.[2] Finally, defendants suggest that Mr. Swomley’s argument regarding damages was excessive, improper and inflammatory.
i. Duke Candidacy
Treating those contentions in order, Mr. Swomley began his cross-examination of Mr. Dowling with the question ”[I]n 1992, you supported the candidacy of David Duke?”[3] Defendants objected, a sidebar conference ensued, the objection was sustained and Mr. Swomley was reminded of the court’s ruling as the trial began that evidence of racial, as opposed to national origin, discrimination, would not be admitted during the course of the trial.[4]
Subsequently, Mr. Swomley asked for a voir dire of Mr. Dowling so that he could explore with him his articulated support of Duke or lack thereof. On voir dire, Mr. Dowling said that he had not supported David Duke. Mr. Swomley then asked for permission to ask Mr. Dowling the same question before the jury and then to call a witness who would impeach him by testifying that he had publicly voiced support for Mr. Duke during Mr. Duke’s campaign. The court permitted plaintiff to ask the question of Mr. Dowling before the jury, permitted the plaintiff to call the rebuttal witness and permitted the rebuttal witness to testify on a variety of acts by Mr. Dowling, including his statements of support for Mr. Duke to a racially mixed group of employees of the Harvard guard service.
Defendants maintain that allowing exploration of the subject of Mr. Dowling’s support for Mr. Duke in the foregoing fashion was unfairly prejudicial and, in addition, ran afoul of the principle that it is improper to call a witness to impeach another witness on a collateral manner. For the latter proposition, defendants cite Leone v. Doran, 363 Mass. 1, 14-16 (1973), vacated in part, 363 Mass. 886 (1973).
The difficulty with defendants’ argument is that the questions about Mr. Dowling’s statements of support for Mr. Duke were not collateral.[5] To be sure, the court did rule at the trial’s commencement, and even earlier, that manifestations of racial prejudice by supervisoiy employees in the Harvard guard service were not relevant to the question whether those supervisoiy employees harbored prejudice on the basis of national origin. But the line between excluded evidence of racial bias and admissible evidence of bias regarding national origin is not a bright one. Moreover, part of the plaintiffs case against Harvard and against Mr. Dowling was that Mr. Dowling, a supervisor, took no action regarding discriminatoiy acts of others against plaintiff that took place either in Mr. Dowling’s presence or with his knowledge. Evidence of Mr. Dowling’s alleged statements of support for Mr. Duke, and the context and setting in which those statements allegedly were made, was relevant to the kind of supervision and tone Mr. Dowling set and tolerated in sensitive manners regarding employee backgrounds. It was thus material to a juiy determination of the truth of plaintiffs contentions that Mr. Dowling knowingly overlooked discrimination practiced by others under his supervision.
ii. Unsupported Questions
Defendants’ next two arguments have to do with certain questions Mr. Swomley asked of witnesses throughout the course of the trial. On numerous occasions, questions Mr. Swomley asked of adverse witnesses suggested that a particular incident had occurred or a particular statement had been made. The questions often produced negative answers from the witnesses. Those negative answers, of course, were not evidence that the statement had been made or that the incident had occurred. In many cases, no evidence of the conduct or statement was produced from a source external to the witness. Finally, in many instances Mr. Swomley referred in a question to the Harvard Crimson or the Ring Report in a manner suggesting that the incident or statement had been reported there even though the court had excluded the Crimson articles and the Ring Report from evidence.
Defendants assert that Mr. Swomley’s repeated reference in his questions to matters not in evidence at the time the question was asked, and were never subsequently proved, amounted to grossly unfair prejudice.[6] They claim that repeated reference by Mr. Swomley to the Crimson articles and to the Ring Report added to that already substantial prejudice. Mr. Swomley, on the other hand, asserts that the questions he asked were based on statements or incidents attributed to the witnesses or to others in Crimson articles or in the Ring Report. He maintains that he believed that the accounts in both sources were true and also believed that the witnesses of whom he inquired would testify truthfully in accordance with the accounts those sources contained. He therefore was entitled, he concludes, to ask the questions he asked. Nothing in the record suggests that Mr. Swomley in fact entertained subjective doubts about the truth of the materials to which he referred or that *559 he subjectively believed that the witnesses would not answer the questions he posed in a manner consistent with the contents of those written reports.[7]
Like much of Mr. Swomley’s other conduct in this case, use of the materials from the Harvard Crimson and from the Ring Report was close to the line. It is clearly improper to ask a question which one knows is improper or which one does not reasonably believe will produce admissible evidence. Supreme Judicial Court Rule 3:07, DR 7-106(C)(l).[8] As Dean Wigmore explained the point,
The jury may under certain circumstances obtain an impression, from the mere putting of illegal questions which are either answered in the negative or are not answered because illegal and excluded, that there is some basis of truth for the question. When counsel puts such a question, believing that it will be excluded for illegality or will be negatived, and also having no reason to believe that there is a foundation of truth for it, he violates professional honor.
6 J. Wigmore, Evidence §1808 at 371 (J. Chadboum rev. 1976) (emphasis added). Put another way,
when, as here, such questioning is raised and then dropped with no further attempt on the part of the State to prove its point, the aforementioned “fishing expedition” having failed, we believe to be wholly improper and highly prejudicial. To allow this sort of examination would be to allow the imaginative and overzealous prosecutor to concoct a damaging line of examination which could leave with the jury the impression that the defendant was anything that the questions, by innuendo, seemed to suggest.
State v. Singleton, 182 P.2d 920, 930 (Ariz. 1947). See also Commonwealth v. Homer, 235 Mass. 526, 534-35 (1920). Quite clearly, then, it is impermissible to engage in a line of inquiry when one has no reasonable expectation of being able to prove the matters to which the line refers or when one knows that the line is otherwise impermissible.
On the other hand, it is not improper to ask a witness a question if one has a good-faith belief that an honest answer to the question will provide evidence material to the issues the case involves. See Commonwealth v. White, 367 Mass. 280, 283-84 (1975). A question properly asked does not retroactively become improper when an anticipated or hoped-for answer does not materialize. Commonwealth v. Bailey, 12 Mass.App.Ct. 104, 107 (1981).
Here, the questions were material. Here, there was a basis for believing the answers Mr. Swomley pointedly sought were true. The fact that some of those questions were clearly based on Crimson articles and on portions of the Ring Report did not mean that either of those sources became part of the evidence. On the contrary, the jury was instructed that the content of Mr. Swomley’s questions was not evidence even if Mr. Swomley purported to read from a piece of paper at the time he asked the questions. Accordingly, although the tactics utilized by Mr. Swomley were troublesome and, as stated, came extremely close to the line separating permissible from impermissible conduct, I do not believe that they crossed that line.
iii. Closing Argument
Finally, defendants argue that Mr. Swomley’s arguments on the issue of punitive damages were prejudicial and impermissible. In addressing the jury on the issue of punitive damages during his summation, Mr. Swomley told the jury that Harvard earned “three million dollars a day in interest” on its endowment and that, by their verdict, the jury should “tell Harvard they won’t make any money today.” Harvard argues that Mr. Swomley’s interest figure was factually wrong, highly inflammatory and justifies a new trial.
In fact, Mr. Swomley’s argument does appear to be wrong. Exhibit 148 is Harvard’s 1996 tax return and is the only document in evidence dealing with Harvard’s financial strength and condition. Exhibit 148 shows that Harvard’s endowment interest income was approximately $750,000 per day in 1994, about 25% of the figure Mr. Swomley used. On the other hand, the same document appears to show that Harvard’s net assets increased by approximately one billion dollars, or roughly three million dollars per day, during calendar year 1994.
The “three million dollar” argument should not have been made for the evidence will not support a conclusion that Harvard earned that much in interest on its endowment. “An argument concerning money damages indulging in significant references to numerical amounts that have no basis in the record is improper.” Harlow v. Chin, 405 Mass. 697, 704 (1989), citing Gardner v. State Taxi, Inc., 336 Mass. 28, 30 (1957). On the other hand, Harvard’s assets did increase by approximately $3 million daily, or so one could infer, during the year in question. The jury had with it the document on which the financial arguments were made and, notwithstanding that document’s complexity, was capable of making rational interpretations of its content. More important, the jury appears to have been uninfluenced by plaintiffs argument for it awarded punitive damages of only $750,000, about 25% of the $3 million figure Mr. Swomley mentioned.[9] Under all of the circumstances, although the argument was improper, I am persuaded that it was harmless. See Mass.R.Civ.P. 61.[10]
B. WEIGHT OF THE EVIDENCE
Defendants’ next argument is that the verdict was clearly against the weight of the evidence. In that regard, defendants argue that the evidence regarding an impermissible motivation for discharging plaintiff was “thin.” Perhaps it was. But I am not of the opinion that it was so “thin” that it cannot stand. There was *560 evidence of national origin discrimination in the security office, there was evidence from which a jury could have concluded that plaintiff was subjected to discrimination because of his particular national origin and there was evidence from which a jury could have concluded that others retaliated against him because of his attempt to communicate with the Harvard Crimson. Surely, other conclusions were permissible as well. But the conclusion the jury reached was not so devoid of evidence that it must be set aside.
C. JURY INSTRUCTIONS
The next contention, made on behalf of Harvard alone, is that the court’s answer to a question asked by the jury was erroneous and led to an impermissible verdict. On the second day of jury deliberations, the foreperson sent the court a note containing the following question:
Question A1
We are confused after reviewing your instructions. If we believe that Harvard’s rational[e] for firing of Mr. Abramian is a pretex[t], are we therefore bound to answer yes[?]
Question Al, the special question to which the foreperson’s question was directed, read as follows:
Did Harvard College (“Harvard”) discharge Plaintiff, Viatcheslav Abramian, because of his national origin?
After conferring with all counsel, and over the objection of counsel for Harvard, the court replied, in writing, to the juiy’s question with the following answer: “The answer to your question is Yes.’ ”
The juiy’s question and the court’s answer came in the context of the now-familiar three-step process for resolving claims of discrimination when direct evidence of discriminatoiy animus is lacking. See generally, e.g., Wheelock College v. Massachusetts Commission against Discrimination, 371 Mass. 130, 137-39 (1976).[11] For present premises, at least, Harvard does not contend that plaintiff failed to make out the prima facie case required for the first step and no one contends that Harvard failed to come forward with evidence showing a nondiscriminatory reason for plaintiffs discharge. The third-stage inquiiy thus became whether the nondiscriminatoiy reason Harvard proffered was “a pretext.”
In urging that the court’s answer to the special question the jury asked was erroneous, Harvard maintains that, although Massachusetts is a “pretext-only” jurisdiction, proof of pretext in the third stage does not, without more, require the juiy to return a verdict in the plaintiffs favor. Instead, Harvard maintains, a finding of pretext simply permits the jury to return a verdict in the plaintiffs favor, and the court should have instructed the jury to that effect.[12] In Harvard’s view, therefore, a third-stage finding of pretext warrants, but does not command, a verdict for the plaintiff. Plaintiff, of course, asserts that a careful reading of decided Massachusetts cases leads to a conclusion that the court’s instruction was entirely proper.
Although the consequences of the Supreme Judicial Court’s declaration that Massachusetts is a “pretext only” jurisdiction have been debated extensively, see, e.g., City of Salem v. Massachusetts Commission Against Discrimination, 44 Mass.App.Ct. 627, 642 n. 21 (1998), that debate largely has focused on the question whether and to what extent a plaintiff must prove an impermissible motivation for a proven pretext. No case yet decided by an appellate court in the Commonwealth has specifically ruled on the question this case presents, i.e., whether proof of a pretext commands a verdict for the plaintiff on the question of discrimination or whether such proof of pretext is instead simply a sufficient basis for a juiy to conclude that discrimination more likely than not occurred. Compare, e.g., Lubell v. First Nat’l Stores, Inc., 342 Mass. 161, 164 (1961). Nevertheless, decided cases do strongly suggest that a finding of pretext at stage three requires, and does not simply permit, a finding of discrimination. Consequently, I am of the opinion that Harvard’s position is not the Commonwealth’s present law.
The “pretext only” rule was first squarely announced, of course, in Blare v. Husky Injection Molding Systems Boston, Inc., 419 Mass. 437 (1995). There, the Supreme Judicial Court described the consequences of the “pretext” rule in the following terms:
The pretext only rule is similar to the pretext plus position in that the presumption created by a prima facie case drops from the case if the defendant satisfies its burden of production, but differs in the third stage in that a plaintiff who has established a prima facie case and persuaded the trier of fact that the employer’s articulated justification is not true but a pretext, is entitled to judgment.
We think the better policy is to remain with our own precedent that, once a plaintiff has established a prima facie case and further shows either that the employer’s articulated reasons are a pretext or by direct evidence that the actual motivation was discrimination, the plaintiff is entitled to recoveiy for illegal discrimination under G.L.c. 15IB.
At the third stage in our order of proof, if the fact finder concludes that the plaintiff has proved that the employer’s reasons are a pretext, then the plaintiff prevails. If the fact finder concludes that the plaintiff did not prove pretext then the defendant prevails. Direct proof of discrimination is not required.
Id. at 443, 444-45, 46. In other words, a plaintiff proceeding under c. 15IB can prove discrimination either by proving a discriminatory animus directly or, having made out a prima facie case, by proving that the employer’s proffered neutral reason for the challenged action was a “pretext.”
*561 The Court’s decision in Blare was consistent with, and built upon a foundation, laid in, Wheelock College v. Massachusetts Commission Against Discrimination, 371 Mass. 130 (1976). There, in describing the role played by proof of pretext, the Court had said the following:
[I)f the employee has proved a prima facie case of sex discrimination and the employer gives an explanation for a hiring decision which has no reasonable support in the evidence or is wholly disbelieved (and hence is transparently pretextual), the employee should prevail.
The burden of proof of unlawful discrimination rests at all times with the complainant. He may meet that burden by establishing an unanswered prima facie case of discrimination. He may also meet that burden by proving by a preponderance of the evidence that the respondent’s facially proper reasons given for its action against him were not the real reasons for that action.
Id. at 138-39.
Although the language quoted from Blare and Wheelock College does not wholly eliminate Harvard’s position, it surely makes that position difficult to sustain. After all, a person who is “entitled” to recover typically is viewed as having an unqualified right to do so, not simply as one who is in the zone of eligibility for recovery. Moreover an unqualified statement that a plaintiff “prevails” or “meets a burden” upon proof of “pretext” does not leave much room to argue that proof of “pretext” in fact does not require a verdict in the plaintiffs favor.
Blare involved an appeal from allowance of a motion for summary judgment and Wheelock College involved an administrative appeal. Subsequent appellate decisions regarding the consequence of proving pretext, however, have occurred in the context of jury trials and have been equally strong. In Handrahan v. Red Roof Inns, Inc., 43 Mass.App.Ct. 13 (1997), for example, the juiy returned a verdict for the plaintiff on special questions. In resolving, the ensuing appellate issues, the Appeals Court stated as follows:
In bringing a claim for handicap discrimination under [c. 151B], the plaintiff bears the initial burden of establishing a prima facie case . . . Once the plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate reason for its actions. Thereafter, the burden shifts back to the employee to show that the employer’s asserted reason was not the true reason, but rather a pretext. “(I)f the fact finder concludes that the plaintiff has proved that the employer’s reasons are a pretext, then the plaintiff prevails.”
The trial judge instructed the jury that “once the plaintiff has established a prima facie case and shows that the employer’s articulated reasons are pretext . . . the plaintiff is entitled to recover for illegal discrimination under Chapter 15IB.” The defendant argues that the judge erred in not instructing the jury that the plaintiff must prove not only that the employer’s asserted reasons are a pretext, but also that they are a pretext for discrimination. [12] Essentially, the defendant asks this court to depart from the teachings of Blare . . .
[ 12 ]We would be remiss if we failed to cite language in Labonte v. Hutchins & Wheeler, 424 Mass. at 821, that “[a] plaintiff could still prevail by showing that the reason given by the employer is merely a pretext for discrimination.”
Acknowledging that the Blare case was an appeal from a grant of summary judgment, we nonetheless believe that we are constrained, even in the face of thin evidence of pretext, to follow the language of Blare. As the judge’s instructions flowed from and were consistent with the teaching of Blare, we cannot rightly say the judge committed reversible error in this regard.
Id. at 14-15, 18-19. See also City of Salem v. Massachusetts Commission Against Discrimination, 44 Mass.App.Ct. 627, 642-47 (1998); Brownlie v. Kanzaki Specialty Papers, Inc., 44 Mass.App.Ct. 408, 418-19 (1998); Carter v. Commissioner of Correction, 43 Mass.App.Ct. 212, 226 (1997).
Subsequently, in Dartt v. Browning-Ferris Industries, Inc., 427 Mass. 1 (1998), the Supreme Judicial Court, although reversing the trial court on other grounds, approved an instruction that put the consequences of “pretext” even more strongly. It did so in the following context for the following reasons:
BFI also argues, in passing, that the jury instructions as a whole did not require the jury to find affirmatively at any stage that BFI was motivated by discrimination. We agree that the burden of persuasion rests with the plaintiff at all times. Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 445 (1995). We have said that at the third stage of proof, “the presumption of discrimination vanishes, and the burden returns to the plaintiff to persuade the court, by a fair preponderance of the evidence, that the defendant’s proffered reason for its employment decision was not the real reason, but is a pretext." Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 128 (1997).[13] We have also said that “[t]he plaintiff bears the burden of persuasion on the ultimate issue of discrimination . . . and therefore must ‘produce evidence sufficient to support a jury verdict that it was more likely than not that the articulated reason was pretext for actual discrimination.’ ” Id. at 128, quoting Blare, supra at 447. Read as a whole, we conclude that the judge’s instructions correctly informed the jury of Dartt’s burden. [18]
[ 18 ]The judge’s instructions to the jury included the following:
*562 “We have now got the plaintiff showing the first three things, handicap, qualified, and termination. Then we have the defendant who is supposed to articulate a legitimate, nondiscriminatory reason. Once the defendant has done that, the plaintiff must prove by a preponderance of the evidence the final part in this test which is that but for the plaintiffs handicap, the defendant would not have terminated the plaintiff. If the plaintiff proves by a fair preponderance of the credible evidence that the defendant’s asserted reason for termination was not the real reason, in other words, that the asserted reason was false or a pretext, then you must find for the plaintiff.” (Emphasis added.)
The judge also instructed as follows: “(T]he third part of the larger test, again with the plaintiff having the burden of proof for all of this, is that the business reason was not the real reason for the termination ..." (Emphasis added.) She later again instructed “the plaintiff has the burden to prove one final element, that but for plaintiffs handicap, the defendant would not have terminated the plaintiff.”
Id. at 11-12. Thus the instruction approved by the Court, like the instruction given to the juiy in this case, told the jury that it “must find for the plaintiff’ if the plaintiff proved the existence of a “pretext.” Although the “must find” language clearly was not the focus of the Court’s approval or attention, it surely is consistent with the language of Blare and its successors.
The cited decisions do not amount to a judicial amendment of Chapter 15 IB changing the statute from one that prohibits discrimination to one that prohibits pretexts. To be sure, there undoubtedly are instances in which an employer’s “pretext” is designed to sidestep a potentially ugly confrontation, to preserve dignity or to otherwise reduce the friction difficult personnel decisions sometimes produce. Consequently, a rule equating “pretexts” with discrimination may sometimes unfairly place a discriminatory label on conduct that truly is not. But the Supreme Judicial Court’s decisions are chiefly concerned with reducing to an acceptable level the risk of erroneous fact finding, cf., e.g., Speiser v. Randall, 357 U.S. 513, 525-26 (1958), in an area where common experience strongly suggests that direct proof of discrimination is often elusive and the pool of benign pretextors is likely quite small. As the Supreme Judicial Court explained it in Blare itself:
[t]he plaintiff prevails on a showing of pretext because “we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer’s actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration ...” Combined with establishment of a prima facie case by a preponderance of the evidence, a showing of pretext eliminates any legitimate explanation for the adverse hiring decision and warrants a determination that the plaintiff was the victim of unlawful discrimination. The plaintiff need not conclusively exclude all other possible explanations for the decision and prove intent beyond a reasonable doubt.
Blare v. Husky Injection Molding Systems Boston, Inc., supra, 419 Mass. at 446.
Under all of those circumstances, I am of the opinion that the governing decisions in this area require a verdict in favor of a plaintiff who has established a primafacie case of discrimination and also has proved that the employer’s proffered reason for an adverse employment decision was a pretext. That is how the juiy in this case was instructed and I am of the opinion that that instruction was correct.
D. DAMAGES
Defendants make two general arguments regarding the damages. First, they argue that the damages, compensatoiy and punitive, were grossly excessive and must be set aside. Second, they argue that the court’s instructions regarding punitive damages were erroneous and require a new trial.
Insofar as compensatory damages is concerned, defendants’ arguments regarding excessiveness are, in part, based on the current judgment that cumulates the verdicts rendered in favor of plaintiff against each defendant. As discussed in Part 4 of this Memorandum, that cumulation is improper.
When the effects of the improper cumulation are removed, the compensatoiy-damage verdict is well grounded in the evidence. The lost wage component of $272,136 is based directly on the testimony of plaintiffs expert. The emotional distress component of $250,000, although high, is not unreasonable if one credits, as the juiy must have, plaintiffs contentions regarding the effects of defendants’ conduct. After all, plaintiff testified that he went from being a homeowner living a reasonably comfortable existence to an impoverished state that, among other things, found him living in a shelter on a day-to-day basis. The juiy was entitled to conclude that the emotional impact of that metamorphosis was enormous.
Although the compensatory damages were appropriate, I am persuaded that the instructions regarding punitive damages were improper. In instructing the juiy on punitive damages, I said, in essence, that
[t]he law provides . .. that you may award damages known as punitive damages not to compensate (plaintiff] but to punish Harvard for any discriminatory discharge you are persuaded it made. In *563 awarding punitive damages, you are to consider Harvard’s financial resources, whether and to what extent Harvard’s conduct was offensive or outrageous and the amount that is sufficient to punish Harvard to prevent repetition of the conduct at issue. You should fix the amount of punitive damages using calm discretion and sound reason. Sympathy or dislike for either pariy should play no role in your decision.
Defendants assert that I should have told the jury that it could not award any punitive damages unless plaintiff proved by a preponderance of the evidence that Harvard’s conduct was outrageous. Outrageous conduct, in Harvard’s view, is an essential predicate for an award of punitive damages, not simply a factor the juiy can consider, along with others, in deciding on what amount of punitive damages to award.
Harvard’s contentions are premised on the Supreme Judicial Court’s recent decision in Dartt v. Browning-Ferris Industries, Inc., 427 Mass. 1 (1998).[14] There, the Court noted that although Chapter 151B, §9, allows recovery of punitive damages, the statute provides no standards for their imposition.[15] Accordingly, the Court held, awards of punitive damages under the statute are to be governed by common-law principles.[16] Quoting from Restatement (Second) of Torts §908(2), the Court continued by holding that punitive damages “may be awarded for conduct that is outrageous, because of the defendant’s evil motive or his reckless indifference to the rights of others.” Having established the standard, the Court then stated that the evidence introduced in the trial was insufficient to take the issue of punitive damages to the juiy. Although the court remanded the case to the trial court for retrial on the issue of liability, it nonetheless ordered, in effect, entry of judgment for the defendant on the punitive-damages issue.
Comments to §908 of the Restatement underscore the force of the Court’s holding in Dartt. In pertinent part, comment b provides as follows:
Since the purpose of punitive damages is not compensation of the plaintiff but punishment of the defendant and deterrence, these damages can be awarded only for conduct for which this remedy is appropriate — which is to say, conduct involving some element of outrage similar to that usually found in crime. The conduct must be outrageous, either because the defendant’s acts are done with an evil motive or because they are done with reckless indifference to the rights of others.
Likewise, comment d says, in part, the following:
[w]hether to award punitive damages and the determination of the amount are within the sound discretion of the trier of fact, whether judge or jury. It is error, however, for the trier of fact to award punitive damages if there has been no bad motive or wanton indifference. An instruction that the jury can award punitive damages in such a case followed by a verdict that indicates from its size that punitive damages have been awarded is ground for new trial.
To be sure, one could argue that all discrimination is sufficiently outrageous, without more, to support an award of punitive damages. Some instances of discrimination, however, are quite technical in character.[17] Moreover, requiring something more than a finding of discrimination before punitive damages can be awarded is appropriate in a “pretext only” jurisdiction. It is one thing to award compensation after the plaintiff has proved the existence of a pretext; it is quite another to allow imposition of punishment in any cases where pretext alone has been shown. That is not, of course, to say that discrimination cannot, by itself, be outrageous enough to support an award of punitive damages. See, e.g., Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 575 (8th Cir. 1997) (‘The requisite level of recklessness or outrageousness can be inferred from management’s participation in the discriminatory conduct”). It is to say that the juiy must find that the defendant’s conduct was outrageous before it may award punitive damages.
The instructions I gave the juiy clearly permitted an award of punitive damages in the absence of a finding that defendants’ conduct was outrageous. The instructions therefore were wrong. The evidence, however, was surely sufficient to permit the jury to reach the requisite conclusion. Viewed in the light most favorable to the plaintiff, the evidence revealed a pervasive pattern of hostility in the Harvard guard service to people who were different, including people who, like plaintiff, were foreign bom and a pervasive pattern of what at best can be characterized as indifference to that conduct by direct supervisors who were in a position to stop it. The question therefore is whether the erroneous instructions were harmless error.
Erroneous Instructions may be harmless if the result the juiy reached was compelled by the evidence, see, e.g., Commonwealth v. Scott, 428 Mass. 362 (1998), or if it is clear from the view of the case the jury took that the error caused no prejudice. See, e.g., Stratton v. Mt. Harmon Boys’ School, 216 Mass. 83, 88 (1913); Carter v. Commissioner of Correction, 43 Mass.App.Ct. 212, 226-27 (1997); Diehard v. Vainest, 3 Mass.App.Ct. 725 (1975) (rescript). Here, however, an award of punitive damages, although warranted, was not compelled by the evidence. Moreover, I cannot conclude from the amounts the jury awarded that they in fact concluded that the defendants’ conduct was outrageous. Twenty-five thousand dollars, while no paltry sum, does not carry with it the indicia of outrage necessary to show that the juiy in fact made the requisite finding. Likewise, $750,000, while an extremely substantial sum in absolute terms, could be viewed on the record of this case as simply 25% of one day’s interest or other accretions to Harvard’s investment portfolio. Seepp. 12-13, supra. In relative terms, *564 then, an award of that sum does not necessarily mean that the juiy was persuaded that Harvard’s conduct was outrageous.[18]
3. MOTION FOR FEES AND EXPENSES
G.L.c. 15 IB provides that the prevailing party is entitled to award of reasonable costs and attorneys fees. Plaintiff has requested an award totaling $270,764.75 in fees and $21,181.01 in expenses fora total of $291,945.76. Defendants oppose plaintiffs request, claiming that the amount requested is excessive.
Under Massachusetts law, it is now clear that awards of attorneys fees are to be centered on an assessment of the reasonable number of hours spent on a matter multiplied by a reasonable fee. As the court put the concept in Fontana v. Abduce Corp., 415 Mass. 309, 326 (1993), “[a] fair market rate for time reasonably spent preparing and litigating a case is the basic measure of a reasonable attorneys fee under State law as well as Federal law." While contemporaneous time records are of assistance to the court in attempting to determine the amount of a reasonable fee, they are not essential under Massachusetts law. Handy v. Penal Institutions Comdr. of Boston, 412 Mass. 759 (1992); Grindle’s Den, Inc. v. Larkin, 749 F.2d 945, 952 (1st Cir. 1984). The court is entitled to use its own judgment based on its first-hand observation of the case in determining whether and to what extent the amount of time counsel claimed to have spent on the case was time reasonably spent. See Handy, supra, 766-67. Likewise, the court is entitled to rely on its own knowledge in determining a fair market rate for the time the lawyer reasonably spent. Id.
In their fee request, plaintiffs counsel seek reimbursement at a variety of rates ranging from $225 per hour to $100 per hour. Viewed in isolation, each of those rates is reasonable given the level of experience of each of the lawyers as revealed by the affidavits they have filed.
The difficulty presented by plaintiffs fee application lies not in the hourly rate counsel seek to charge but in the detail of what was done during the time each counsel spent working on the case. In that regard, the supporting affidavits are, at best, opaque. Accordingly, it is impossible, on an item-by-item basis, to determine which expenditure of time was reasonable and which was not. One solution for that problem would be to require plaintiffs counsel to redo the fee application. Assuming, however, that the records counsel have submitted are in fact the records they contemporaneously kept, such a solution is likely to be unhelpful at best.
A second path of escape, and the one I select, is to determine a weighted average hourly charge based on plaintiffs actual submission and then apply that weighted average charge to my own independent determination of the reasonable amount of time spent in preparing and trying the case. That approach has the benefit of using plaintiffs actual claim as a foundation for a fee award and using that foundation to build a fee that ultimately is reasonable.
As stated, the total amount plaintiff seeks for attorneys fees is $270,764.75. The total amount of hours recorded in their submissions, including the hours spent by Richard H. Slicer, plaintiffs initial attorney who filed an attorneys lien, is 1,554.75. Dividing the fee claimed by the hours claimed, one derives a weighted average fee of $174.15, an amount which I round off to $175.
Turning from fee to hours reasonably expended, the trial lasted three weeks. Trial sessions began each day at 9 a.m. and ended at 1 p.m. I believe that 3 hours of preparation time for every hour of time spent in court were reasonable while the case was on trial. I therefore believe that a total of 16 hours per trial day was reasonable.[19] That produces a total of 240 hours it was reasonable to spend on the actual trial of the case.
In addition, of course, it was necessary for counsel to spend time preparing the case for trial. For a trial of this length, remarkably little time was spent in traditional pre-trial discovery. Instead, much of counsel’s trial preparation time was consumed by factual investigation including a thorough assessment of various articles that had appeared in the Harvard Crimson. Additional time also was spent on researching and analyzing various legal theories that counsel believed bore on one or more of the issues the trial concerned. Counsel, of course, are not to be penalized because they did not engage in formal discovery. On the other hand, an assessment of time reasonably spent must take into account what was done by these lawyers in this case, not what some other lawyers would have done in some other case. With that principle in mind, I am of the opinion that 500 hours, or approximately twice the time spent during trial, was a reasonable amount to spend in trial preparation.
Finally, counsel are entitled to an award for the time reasonably spent on post-trial matters. Given the nature and complexity of the post-trial motions, I am of the opinion that 60 hours, or one and one-half person weeks, was a reasonable amount to spend in their preparation and argument.
Thus assessed, 800 hours was a reasonable amount of time to spend on preparation for, and trial of, this case and on post-trial motions. Multiplying that number by a fee of $175 per hour produces a fee of $140,000.00. I am of the opinion that is a fair and reasonable fee for the work performed in this case.
In addition to seeking an award of attorneys fees, counsel has sought reimbursement for expenses in the total amount of $21,181.01. Defendants have not objected to any of plaintiffs requests and, on their face, they are reasonable. I therefore allow plaintiffs request ifor them. Allowance of plaintiffs requested amount for expenses brings to $161,181.01 the total *565 award for attorneys fees and expenses I deem reasonable.
4. MOTION TO ALTER OR AMEND THE JUDGMENT
Both sides have filed motions to amend or alter the judgment entered following the jury’s verdict. Plaintiff seeks to have the judgment amended so as to increase the judgment’s total value. Defendants seek amendments that would have the effect of reducing that value.
To set the stage for discussing the motions it is important to understand that the jury was asked to answer special questions in four separate areas. The first concerned Harvard’s conduct and had to do with discrimination. The second had to do with whether the individual defendants aided and abetted any discrimination in which Harvard had engaged. The third had to do with whether Harvard engaged in retaliation. Fourth and finally, the jury was asked a series of questions having to do with whether the individual defendants interfered with the contractual relations between Harvard and plaintiff.
In response to the first set of questions, the jury concluded that Harvard had engaged in discrimination and awarded damages in four areas: past lost wages in the amount of $116,866, future lost wages in the amount of $155,270, emotional distress damages in the amount of $250,000 and punitive damages in the amount of $750,000. The total amount of compensatory damages thus amounted to $522,136. The total amount of damages including the punitive damages amounted to $1,272,136.
In response to the second set of questions, the jury concluded that two of the four individual defendants, Dowling and Henaghan, aided and abetted Harvard’s discrimination and assessed punitive damages against each of them in the amount of $25,000.[20]
In response to the third set of questions, the jury found that Harvard had engaged in retaliatory conduct and that, as a consequence, plaintiff was entitled to damages in precisely the same amounts for precisely the same elements as the jury had specified in response to the first set of questions.
Finally, in response to the final set of questions, the jury concluded that three of the four individual defendants, Johnson, Dowling and Henaghan, had interfered with the contract between plaintiff and Harvard and awarded damages in the amount of $522,136.
The evidence presented at trial regarding the four different areas of inquiry was tightly interwoven. To be sure, plaintiff focused on the specific action and inaction of each specific defendant as the trial progressed. There was no hint or suggestion, though, that the different behaviors of the different individual defendants produced identifiably separate damages or that any particular conduct of any particular defendant produced any particular component of plaintiffs overall harm. Instead, plaintiffs focus was on the mental suffering he had experienced during the course of his employment at Harvard and thereafter and the economic consequences to him of his ultimate discharge.
At one point during the course of deliberations, the jury asked, in substance, whether damages awarded in response to the various questions on the verdict slip would be cumulated. Without objection, the jury was told they would not be. When the verdict ultimately was returned, the court, after observing that the jury had awarded punitive damages against Harvard in the amount of $750,000 in response to question A3, which dealt with discrimination, and also had awarded punitive damages against Harvard in the amount of $750,000 in response to question C3, which dealt with retaliation, asked counsel whether they wished to have the jury indicate, on the verdict slip or otherwise, whether they intended to award punitive damages totaling $1,500,000 or $750,000. Both sides asked the court not to inquire further of the jury on that score and to decide the matter itself.
The judgment that entered thereafter awarded damages against Harvard in the amount of $1,272,136 with interest from the date the action was commenced, awarded damages against Johnson in the sum of $522,136 with interest from the date the action began and awarded damages against Dowling and against Henaghan in the amount of $547,136 with interest from the date the action began.[21] It is against that backdrop that both sides have made their respective motions.
It is axiomatic that “where the same acts cause the same injury under more than one theory . . . duplicative damage recoveries will not be permitted. ” Calimlim v. Foreign Car Center, Inc., 392 Mass. 228, 236 (1994). See also Refuse & Environmental Systems, Inc. v. Industrial Services of America, 732 F.Sup. 1209, 1213 (D.Mass. 1990). Here, no matter how one scrutinizes, divides or parses the evidence presented at trial, that evidence furnishes no basis for a rational division and allocation, either to separate defendants or to separate claims for relief, of what are essentially undivided compensatory damages.
Insofar as lost past and future income is concerned, the point is obvious. Plaintiff lost one job from which he had, and anticipated, one income stream. He is entitled to one recovery for that loss regardless of how many people participated in creating it. Insofar as emotional damages are concerned, the point is only slightly less clear. The evidence at trial showed one set of emotional damages flowing from one essentially undivided set of actions that combined to produce a single, albeit continuing, adverse mental impact.
To be sure, punitive damages are theoretically different. They are designed not to compensate for an identifiable loss but to punish for past conduct. There is, therefore, no necessary reason why separate acts could not be separately punished even though those *566 acts produced only one set or kind of identifiable loss. With that in mind, the individual punitive damages assessed against Dowling and Henaghan are not subsumed in the actual or punitive damages assessed against Harvard or the other defendants. Likewise, there is no necessary reason why the punitive damages assessed against Harvard for discrimination and those assessed against Harvard for retaliation cannot be cumulated. Clearly, the discrimination found by the jury and the retaliation found by the jury were separate acts each of which violated a provision of c. 151B.
Nevertheless, and if am in error in my decision regarding punitive damages, see pp. 24-28, supra, I am of the opinion that the punitive damages assessed against Harvard should not be cumulated. Punitive damages are designed as a mechanism by which the community, as the jury represents the community, expresses condemnation for behavior in which an individual defendant has engaged. See generally Bain v. City of Springfield, 424 Mass. 758, 767 (1998); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21 (1991). Except as an inevitable byproduct of that societal function, punitive damages are not designed to enrich a plaintiff and they play no compensatory role in restoring to a plaintiff something he or she lost. It follows, therefore, that in assessing the adequacy, inadequacy or excessiveness of punitive damages, the court has, and ought to have, a greater role than it has when reviewing what the jury has done with respect to compensation. See generally Labonte v. Hutchins & Wheeler, 424 Mass. 813, 826-27 (1997).
With those principles in mind, I am of the opinion that the $750,000 in punitive damages the jury awarded with respect to discrimination should not be added to the $750,000 the jury awarded for retaliation. The discrimination and the retaliation, while clearly separate acts, were tightly intertwined components of the relationship between Harvard and plaintiff. Punitive damages in the amount of $750,000.00 are surely sufficient to cause Harvard to notice the jury’s displeasure with the conduct in which its employees participated and the degree to which society is unprepared to accept that conduct. Once that message has been delivered in appropriately ringing terms — and $750,000.00 surely has a clear and distinct tone— there is little societal interest or utility in continuing to ring the bell.
Finally, on the subject of damages, although it surely appears that the compensatory damages assessed against Johnson, Dowling and Henaghan in response to the part four questions were designed to compensate for exactly the same wage and emotional distress damages assessed against Harvard, the jury was not asked to break out the losses into their respective components. After the verdict was returned and before the jury was discharged, no one sought further jury questions intended to allow the jury to announce which portions of the damage awards against the individual defendants were for past lost wages, which were for future lost wages and which were for emotional distress. Consequently, while it is clear that the damages as a whole were designed to compensate for the same losses assessed against Harvard and thus ought not to be added to the damages awarded against Harvard, I am unwilling to exercise whatever discretion I may otherwise have, see Mass.R.Civ.P. 49(a), to break the unified damage award into its component parts for purposes of determining when prejudgment interest begins to run.
ORDER
In light of a foregoing, it is hereby ORDERED that
A. Defendants’ Motion for Judgment N.O.V. (Paper No. 36) is DENIED.
B. Defendants’ Motion for a NewTrial (Paper No. 37) is DENIED except to the extent that it seeks a new trial on the issue of punitive damages and to that extent it is ALLOWED. Retrial of the punitive damages issue may well require introduction of almost all of the evidence that was introduced at the trial itself. Before undertaking that burden, the court and the parties ought to be assured that I have correctly applied the principles of law applicable to punitive damages as well as the principles applicable to the remaining issues the case involves. Accordingly, if an appeal is taken by any party from the final judgment ordered below, I report to the Appeals Court pursuant to Mass.R.Civ.P. 64 the question whether I have correctly decided the punitive damages issue this case involves.
C. Plaintiffs Motion for Attorneys fees (Paper No. 52) is ALLOWED in the total amount of $161,181.01.
D. Defendants’ motion to alter or the judgment on special questions (Paper No. 38) is ALLOWED and plaintiffs motion to alter or the judgment on special questions (Paper No. 39) is DENIED. The judgment entered on July 1, 1997 (Paper No. 35) is VACATED. A new judgment shall enter in the following terms:
1. Against defendant, President & Fellows of Harvard College, Paul E. Johnson, Robert J. Dowling, and Thomas Henaghan in the amount of $522,13,6, jointly and severally. Interest on the judgment against defendant, President & Fellows of Harvard College, shall commence on October 14, 1993 but shall be calculated on the sum of $116,866 only. Interest on the judgment against Paul E. Johnson, Robert J. Dowling and Thomas Henaghan shall commence on October 14, 1993 and shall be calculated on the entire judgment.
2. Against defendant, President & Fellows of Harvard College, in the additional sum of $161,181.01 without interest.
E. The Judgment ordered in ¶0 hereof shall enter forthwith. There is no just reason for delay because *567 all of the principal legal issues in the case have now been resolved. If there is to be a new trial as to any aspect of the punitive damage claims, the time and expense required for that trial dictates that it occur after an appellate court has heard and resolved any other issues the parties may choose to raise on an appeal. Moreover, unless I have resolved those other issues correctly, there may be no foundation for any award of punitive damages.

Lack of subject-matter jurisdiction, of course, may be raised at any time. See Attorney General v. Baldwin, 361 Mass. 199, 203 (1972). Neither side has explored in its brief the jurisdictional implications, if any, of the federal preemption claim defendants now make. I assume, therefore, that defendants contend that federal law supplies the required rules of decision, not that federal law divests this court of jurisdiction to decide the claims they contend federal law covers. See generally Driscoll v. Boston Edison Co., 25 Mass.App.Ct. 954, 954-55 (1988).

The “Ring Report” was a report authored by an outside consultant Harvard’s then General Counsel had hired to investigate allegations of discrimination in the Harvard guard service. The Report generally found that discrimination was not present in the service.

In 1991, David Duke, whose background included an affiliation with the Ku Klux Klan, ran for governor of Louisiana in a race that drew considerable national interest.

That ruling, which I continue to believe was correct, was nonetheless not one I made without some careful consideration and is not one that is free from doubt. If an individual manifests prejudice against another individual because of, say, the color of the other individual’s skin, it would not necessarily be irrational for one to conclude that that individual would be more likely to discriminate against others on different but equally irrational grounds than one who did not display prejudice because of skin color. On the other hand, this was a case involving alleged discrimination against plaintiff because he was a first-generation immigrant from Russia. There is no clear nexus between one’s tendency to discriminate against an individual because of race and anti-Russian animus. In making the restrictive ruling I made, I gave greater weight to the latter consideration than I did to the former.

Whether Mr. Dowling in fact supported Mr. Duke was not material but the interrogation centered on what Mr. Dowling said and under what circumstances he said it, not on what he privately believed or did not believe.

 In a related vein, defendants take issue with the statement in summation by Mr. Swomley that plaintiff did not “drink, do drugs, or even masturbate while on duty.” There had been testimony that a white, native-born guard had been found away from his post one evening with his pants down or in a disheveled position. There also was evidence that the guard was watching television at the time he was found in that condition. There was evidence that a report concerning the incident had been generated and sent to supervisors in the guard office but that the guard had not suffered any significant discipline as a consequence. Treatment of this guard was something the jury could contrast with the manner in which plaintiff was treated for his various violations of uniform regulations while he was work. The “masturbation” reference in Mr. Swomley’s summation was, like much of his interrogation of the guard needlessly humiliating, mean-spirited and close to the line. The way he phrased the matter in summation, however, did not suggest that that is what the guard had been doing. Indeed, he did not specifically tie that portion of his summation to the guard in question or to any identifiable member of the Harvard guard service. He simply stated that plaintiff had not engaged in that activity.

That may end the inquiry. See, e.g., Williams u. Mensey, 785 F.2d 631 (8th Cir. 1986). If it does not, then I am of the opinion that the burden is on the defendants, as those claiming the questions were improper, to show that a reasonable person in Mr. Swomley’s position would not have held the same beliefs as to the likelihood of favorable witness answers. Defendants, on the present record, have not met that burden.

That reference is to the rule in effect at the time of the trial. A similar rule appears in the rules that became effective on January 1, 1998. See SJC Rule 3:07, Disciplinary Rule 3.4(e), 426 Mass. 1301, 1389.

Harvard argues that the “three million dollar" argument caused the jury to award one million dollars in combined pain and suffering and punitive damages and thereby demonstrates the prejudice Harvard suffered in the argument’s wake. The jury, however, was instructed that very different considerations applied to calculation of compensatory damages, including pain and suffering, and to calculation of punitive damages. It is not appropriate to assume now that the jurors lumped the two concepts together in a manner that disregarded the instructions they had been given. See generally, e.g., Commonwealth v. Gunter, 427 Mass. 259, 263 (1998). Even if one improperly lumps the two together, however, it is difficult to see how an implied request for “three million dollars” influenced the jury to award one million dollars that it probably would not have awarded if the implied request had not been made.

I have decided this issue in the event that I am incorrect in the way in which I have decided defendants’ claim that my instructions on punitive damages were erroneous. See pp. 24-28, infra.

The instructions required the jury to proceed through the three-step process, first determining whether the plaintiff had presented a prima facie case, then determining whether Harvard had come forward with credible evidence of a nondiscriminatory reason for his discharge and then determining whether that nondiscriminatory reason was a pretext. The jury also was instructed with respect to what they were to do in the event they concluded at any stage that the party with the burden of proof had failed to meet that burden. But cf. Brownlie v. Kanzaki Specialty Papers, Inc., 44 Mass.App.Ct. 408, 418 n.12 (1998).

Defendant asked the court to answer the jury’s question in the following fashion:
Mr. Abramian’s burden is to persuade you by a preponderance of the evidence that Harvard would not have fired him but for his national origins. If you think that the answer to that question is yes, then check yes. If you think that the answer to that question is no, then check no. You are entitled, but not required, to infer trom the finding of — from a finding of pretext on your part that the true reason is national origin discrimination.
That request succinctly captured the essence of defendants’ present claim of error.

I am of the opinion that the Court did not intend, or view, its holding in Matthews as a repeal or modification of what it had said in Blare. The Court cannot possibly have been unaware of the widespread interest attached to its Blare decision. Accordingly, it is highly unlikely that it would undertake to modify that decision in a significant way unless it did so in clear and unmistakable terms.

The Dartt decision was rendered after this trial was completed. Plaintiff therefore suggests that it should not be applied to defendants’ motion. The law is otherwise. See Galvin v. Welsh Mfg. Co., 382 Mass. 340, 343-44 (1981).

The statutory language is as follows:
If the court finds for the petitioner, it may award the petitioner actual and punitive damages. If the court finds *568 for the petitioner it shall, in addition to any other relief and irrespective of the amount in controversy, award the petitioner reasonable attorneys fees and costs unless special circumstances would render such an award unjust.
G.L.c. 151B, §9.

The Court’s reference to common-law principles was necessarily a reference to the common-law of other jurisdictions, for, under the common law of the Commonwealth, punitive damages cannot be recovered. See Pine v. Rust, 404 Mass. 411, 415 (1989).

The discrimination in Dartt itself was arguably of that character. The Supreme Judicial Court held there that the trial court had properly denied the defendant’s motion for a directed verdict on plaintiffs claim for discrimination under Chapter 151B because there was evidence from which a jury could have concluded that plaintiff had a “handicap,” as that term is defined Chapter 151B, §1(17), and that the defendant discharged him because of that “handicap.” It appears, however, that the “handicap" in question was wholly a creature of statute and had to do with the way defendant perceived plaintiff, not with limitations or disabilities plaintiff in fact possessed.

If I am wrong in my application of the legal principles and the jury was properly permitted to consider punitive damages on the instructions I gave them, then I am of the opinion that the amount the jury awarded was not excessive. In assessing punitive damages, the jury was entitled to take into account not only the ability of the defendants to pay but also who the defendants were, the nature of the conduct in which they had engaged, the duration of that conduct and the consequences it produced. The jury was entitled, in other words, to consider any factors relevant to the question of appropriate punishment. When those factors are considered together, I cannot say that the verdict was excessive.

In so saying, I recognize that at least two lawyers were present in court each trial day for the plaintiff. I base my conclusion regarding the amount of time that would reasonable to spend on the case each trial day on the nonduplicative tasks that had to be accomplished in order to prepare for each day’s testimony and for the other events that were likely to occur each trial day regardless of the number of lawyers actually engaged in preparing for them.

The jury was not asked to assess compensatory damages against the individuals.

The actual interest awarded on the judgment against Harvard was less than the interest awarded on the judgment against the individual defendants. That seeming anomaly resulted from the fact the clerk calculated interest on the Harvard judgment only on that portion which dealt with past lost wages. The judgment against the individual defendants did not specify what the damages covered and thus the clerk included interest on the entire judgment.